**RAY INDUSTRIES, INC., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE CO., Defendant.**

**Civ. A. No. 88–73445.**

United States District Court, E.D. Michigan, S.D.

Dec. 1, 1989.

---

Jack D. Shumate and Darlene Domanik, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., and Henry G. Kolb, Brunswick Corp., Skokie, Ill., for plaintiff.

Sandra Prokopp, Beresh & Prokopp, Novi, Mich., and James P. Whitters, III, Gaston & Snow, Boston, Mass., for defendant.

## MEMORANDUM OPINION

FEIKENS, District Judge.

This declaratory judgment action is before me for final disposition on cross motions for summary judgment. Jurisdiction is based on 28 U.S.C. § 1332, diversity of citizenship. Accordingly, I must apply Michigan's substantive law.

Plaintiff Ray Industries, Inc. ("Ray") originally filed this suit, seeking to establish coverage under insurance policies issued to it by defendant Liberty Mutual Insurance Company ("Liberty"). Ray wants a declaration that these policies cover the costs of defense and indemnification of an Environmental Protection Agency ("EPA") action regarding Ray's alleged contamination of the Metamora Landfill ("Metamora"). Liberty contends that the policies do not cover such defense costs and indemnification. The parties have submitted stipulated facts. Therefore, under Federal Rule of Civil Procedure 56, summary judgment is proper.

The parties agree on what policy terms apply, and on the dates these policies were in effect. They disagree as to the proper interpretation of these policy provisions. Since construction of insurance contracts is a question of law, *Jones v. Farm Bureau Mutual Insurance Co.*, 172 Mich.App. 24, 431 N.W.2d 242 (1988), I will interpret these policy provisions and apply them to the stipulated facts.

From 1938 until July 1, 1979, Liberty insured Ray and its subsidiary, Sea Ray Boats, Incorporated of Michigan ("Sea Ray"), with a series of comprehensive general liability policies. Between 1970 and 1979, Liberty also sold Ray and Sea Ray a series of umbrella excess insurance policies. The parties have not located copies of any of the policies in effect from 1966 until 1971, or several policies effective from 1971 until 1979. The parties agree, however, that the general insuring provision in these policies states in relevant part:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A. bodily injury or
>
> Coverage B. property damage
>
> to which the policy applies, caused by an *occurrence*, and the company shall have the right and duty to defend any suit against the *insured* seeking *damages* on account of such *bodily injury* or *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

*Statement of Stipulated Facts for Purpose of Cross–Motions for Summary Judgment Only,* filed September 20, 1989, at p. 2 (emphasis in original).

The policies define an "occurrence" as "an accident, including continued or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.*

On July 1, 1971, Liberty added a pollution exclusion to all its subsequent policies. This provision states:

> This policy does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

*Id.* at p. 3.

The parties also agree on the events that led to the release of Ray's wastes at Metamora, and on Ray's knowledge of these releases. During the relevant time period, Sea Ray manufactured boats in Oxford, Michigan. In the course of this business, Sea Ray generated 55–gallon drums or barrels as waste, which it transported to Metamora.

Sea Ray transported these drums to the landfill for approximately thirteen years. It generally disposed of its own barrels until the early 1970's, making daily deliveries at various times. From 1972 through 1979, Sea Ray hired Bushman's Disposal, Incorporated ("Bushman's") to haul most of its waste to Metamora; Sea Ray still made infrequent trips itself. Sea Ray had no knowledge of or control over Bushman's disposal and treatment of its waste.

The drums Sea Ray delivered contained varying amounts of a resinous material now suspected by EPA of contaminating the landfill. Some of Sea Ray's barrels arrived empty at the landfill; some contained four to five inches of a sticky resi-nous material; and some were up to one-quarter full of this substance. This residue was at different times liquid, semi-solid and solid. Some of the drums arrived open and some were closed.

Although Sea Ray had no knowledge of or control over Metamora's handling of its drums after delivery, the parties agree on what happened to the drums at Metamora. Originally, the barrels were dumped at the open face of the landfill, or at the outer edge of an excavated area. Landfill employees then used a front-end loader to push the barrels into their desired location.

Landfill employees next used a huge machine called a Trash Master to crush the barrels. The Trash Master weighed at least 27 tons, and had six-inch metal spikes on its wheels. This machine occasionally tore apart Sea Ray's barrels, releasing the resinous contents onto the ground.

Metamora's owner, Russell Parrish, eventually became annoyed at the mess these resins created, and began to have certain of Sea Ray's drums put in a separate area. On a daily basis, Metamora's operators pushed Sea Ray's barrels together, covered them with earth, and packed them down by running a front-end loader over them. The Trash Master was also used occasionally to pack down the drums. After the drums were layered in this manner, Metamora's operators made a special effort to keep heavy machinery off the burial site.

Ray and Liberty agree that Metamora's operators did not expect or intend their drum burial process to cause any releases. In fact, they believed that packing earth around the barrels would prevent breakage. Contrary to this expectation, Ray's expert witness, Dr. Lawrence Halfen, would testify, if called, that these burial activities probably crushed many of the drums and released their contents.

In approximately 1972, a drum disposal area at Metamora ignited and burned for several days. Ten barrels exploded. Although there is no evidence that Sea Ray's drums were involved, the EPA now holds

Sea Ray responsible for this area's contamination. Metamora closed in 1980.

Sea Ray representatives would testify, if called, that Sea Ray knew nothing about Metamora's disposal activities, did not anticipate the releases of its resins, and did not expect or intend any property damage. Sea Ray did not know its waste was hazardous, and Dr. Halfen would testify, if called, that it is unclear whether this material was, or is now, hazardous. Sea Ray believed it complied with the laws applying to its disposal activities.

On July 1, 1985, Sea Ray received a letter from EPA stating it considered Sea Ray a potentially responsible party ("PRP letter") for hazardous contamination at Metamora. EPA intends to hold Sea Ray * jointly and severally liable for the costs of studying and cleaning up all of Metamora's contamination. These costs will probably exceed $37 million. No complaint has been filed in a court of law against Sea Ray.

On May 28, 1986, Ray notified Liberty of EPA's claim, demanding indemnification and defense costs. Two years later, Liberty denied coverage. On August 19, 1988, Ray filed this suit seeking declaratory judgment.

As an initial matter, Ray has argued that I should give effect to its reasonable expectation that its insurance policies would cover the Metamora contamination. Ray claims Liberty should be estopped from arguing against coverage. I addressed these issues at a hearing on October 10, 1989, after Liberty moved to strike certain exhibits attached to one of Ray's briefs. Ray had submitted documents explaining the parties' intent regarding the policies. I held at the hearing that I would not consider the disputed exhibits as facts, but only as arguments.

Because Ray and Liberty agree on the policy provisions that apply, and they do not argue these provisions are ambiguous, I will not consider Ray's expectation of coverage. I must only interpret the contract terms. *See Allstate Insurance Co. v.*

*Freeman,* 432 Mich. 656, 712, 443 N.W.2d 734 (1989); and *Moore v. Campbell Foundry,* 142 Mich.App. 363, 367, 369 N.W.2d 904 (1985) (It is well settled that where an agreement's language is unambiguous, the parties' intent must be discerned from the words used in the instrument.).

The parties have raised three issues, which I will discuss in the following order. First, did the PRP letter trigger Liberty's duty to defend? Second, was there an "occurrence" as defined in the policies? Finally, does the pollution exclusion apply?

## I. THE "POTENTIALLY RESPONSIBLE PARTY" LETTER

Liberty first argues it has no duty to defend because under *City of Evart v. Home Insurance Company,* No. 103621 (Mich.App., April 10, 1989), a PRP letter does not constitute a "suit." The policies only require Liberty to defend "suits":

> [T]he company shall have the right and duty to defend any *suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

*Statement of Stipulated Facts, supra* at p. 2 (emphasis added).

The Michigan Supreme Court has not addressed the question whether the term "suit" encompasses a PRP letter. As a result, the federal courts in this state have split on the issue. At least two cases have recently held that a PRP letter is not a suit: *Central Quality Services Corp. v. Insurance Company of North America,* No. 87–74473 (E.D.Mich. Sept. 6, 1989), and *Arco Industries Corp. v. The Travelers Insurance Co.,* No. K–88–380 (W.D.Mich. June 26, 1989). Two others have held the opposite: *Higgins Industries, Inc. v. Fireman's Fund Insurance Co.,* 730 F.Supp. 774 (E.D.Mich.1989), and *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.,* 662 F.Supp. 71 (E.D.Mich.1987).

---

* EPA also notified several other companies that they were potentially responsible for Metamora's contamination.

The Michigan Court of Appeals recently held in an unpublished, per curiam ruling that the term "suit" as used in this clause does not include a notice letter sent by the Michigan Department of Natural Resources. *See City of Evart, supra.* Liberty argues that under *West v. American Telephone and Telegraph Company,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), I am bound by this precedent. I disagree.

■ Because this opinion is unpublished, it is not precedentially binding. M.C.R. 7.215(C)(1). *See also Nixon v. Celotex Corporation,* 693 F.Supp. 547, 553 (W.D. Mich.1988) ("Although defendants cite unreported Michigan Court of Appeals cases to the contrary, those cases are not binding on this court. *See* M.C.R. 7.215(C).").

I have held in a similar case that under *United States Aviex Co. v. Travelers Insurance Co.,* 125 Mich.App. 579, 336 N.W.2d 838 (1983), the term "suit" includes such a PRP letter. *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987). In *Aviex,* an insured won a judgment declaring its insurer's duty to defend, based only on "threats of legal action" by the Michigan Department of Natural Resources. The Michigan Attorney General then filed a court action seeking an injunction directing the insured to clean up a chemical spill. The Michigan Court of Appeals affirmed judgment against the insurer because:

> It is merely fortuitous ... that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover these costs.

*Aviex, id.* 125 Mich.App. at 590, 336 N.W.2d 838.

■ Based on this Michigan authority, I held that a "suit" includes a PRP letter, and any other effort to impose on the policyholders a liability ultimately enforceable by a court. *Fireman's Fund, id.* 662 F.Supp. at 75. Since *City of Evart* is not precedentially binding, it does not affect *Aviex,* or my application of that case in *Fireman's Fund.*

More important, the Michigan Court of Appeals recently reconsidered this issue, explicitly reaffirming *Aviex* and *Fireman's Fund,* and disavowing *City of Evart. Polkow v. Citizens Insurance Co. of America,* 180 Mich.App. 651, 447 N.W.2d 853 (1989). In *Polkow,* the court held that a Michigan Department of Natural Resources letter requiring an insured to investigate and remedy environmental contamination triggered the insurer's duty to defend. The court stated, "In our view, subjecting the insured to administrative mechanisms mandating an environmental investigation and cleanup, backed by the power to expose the insured to a money judgment in a court of law, amounts to a 'suit' for purposes of invoking the coverage of a policy." *Id.,* 180 Mich.App. 651, 447 N.W.2d at 855.

*Polkow* delineates the cases composing Michigan law on this point. Accordingly, under *Aviex, Fireman's Fund,* and *Polkow,* I hold that Liberty's duty to defend Ray was triggered by the PRP letter.

## II. DEFINITION OF "OCCURRENCE"

■ The second main issue in dispute is whether the events leading to the release of Sea Ray's waste constitute an occurrence. The policies state:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A. bodily injury or
> Coverage B. property damage
>
> to which the policy applies, caused by an *occurrence* ....

*Statement of Stipulated Facts, supra* at p. 2 (emphasis added). The policies define an "occurrence" as "an accident, including continued or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.*

This definition focuses on the insured's expectation regarding damage. *United States Fidelity and Guaranty Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 33 (6th Cir. 1988). The Michigan Supreme Court has

recently held that courts must apply a subjective standard when interpreting the clause "neither expected nor intended from the standpoint of the insured." *Allstate Insurance Co. v. Freeman, id.,* 432 Mich. 656, 443 N.W.2d 734. "Thus, the finder of fact may exclude coverage either for actions in which the insured subjectively *expected* injury or loss or where the loss is the consequence of the insured's subjective intention both to the act itself and the resultant harm." *Id.* at 731, 443 N.W.2d 734. (emphasis in original). The insured need not have intended the actual injury inflicted; it is enough if the insured subjectively expected some *type* of harm reasonably foreseeable from the insured's standpoint. *Id.* at fn. 13.

Although a subjective standard must be used, courts may in some cases presume intent. *Allstate Insurance Co.* at 719–720, 443 N.W.2d 734. For example, where an insured's denial of intent to injure "flies in the face of all reason, common sense and experience," intent may be presumed. *Id.* at 720, 443 N.W.2d 734.

Liberty and Ray have stipulated to the facts necessary for me to decide whether, applying this subjective standard, an "occurrence" took place. The parties agree Sea Ray did not actually expect or intend that any property damage would result from its drum disposal practices. *Statement of Stipulated Facts, supra* at p. 8.[1] Sea Ray did not know its wastes were hazardous when it disposed of the barrels. *Id.* In fact, Sea Ray cannot yet be certain these wastes were hazardous. *Id.* Finally, Sea Ray believed its drums and disposal practices conformed with the laws existing at that time. *Id.*

I find that given this stipulation, a covered "occurrence" took place. The only evidence before me is that Sea Ray did not expect or intend any property damage. This is the determinative issue under *Allstate Insurance Co. v. Freeman.*

This case does not present one of the egregious situations in which I may presume an intent to cause damage. The damage or injury at issue here is the contamination of Metamora Landfill. Even if Sea Ray expected or intended the release of its resins into the landfill, it did not expect or intend the damage, contamination. Sea Ray did not then know its resins were hazardous, and this question is still unresolved. *Allstate Insurance Co. v. Freeman* requires Sea Ray to have intended this damage. Sea Ray's denial of this intent does not fly in the face of common sense, but is consistent with the evidence before me.

### III. THE POLLUTION EXCLUSION

I find that Sea Ray's PRP letter triggered Liberty's duty to defend. I also find a covered "occurrence" took place under *Allstate Insurance Co. v. Freeman.* Thus, unless the pollution exclusion applies, Liberty's policies cover the contamination of Metamora. The pollution exclusion states:

> This policy does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

*Id.* at p. 3.

■ The parties agree this pollution exclusion first appeared in the policies on July 1, 1971. *Statement of Stipulated Facts, supra* at p. 3. Accordingly, I find that the policies cover contamination caused before July 1, 1971. The final issue is whether the pollution exclusion bars cov-

---

1. More precisely, the parties stipulated that Ray's representatives submitted sworn affidavits to this effect. In a letter dated November 8, 1989, I asked the parties if they stipulated to the content of this testimony. They responded in a joint letter that Liberty only stipulated that these affidavits constitute the evidence before me. Since Liberty has introduced no evidence to rebut these affidavits, or even evidence on which to base a contrary inference, summary judgment is appropriate. *See* Fed.R.Civ.P. 56(e).

erage from July 1, 1971 through July 1, 1979. Liberty argues the exclusion applies. Ray contends that an exception to the exclusion applies, because its releases were "sudden and accidental." For the reasons stated below, I find that the pollution exclusion applies, abrogating Liberty's duty to indemnify Ray for the years in which the exclusion was in effect.

The Michigan Court of Appeals addressed this issue in *Polkow v. Citizens Insurance. Id.,* 180 Mich.App. 651, 447 N.W.2d 853, 855–856 (1989). In *Polkow,* the court interpreted a similar pollution exclusion clause; the policy did not cover pollution-related damage unless the discharge was sudden and accidental. The insured sought a declaration that its liability insurer had duties to defend and indemnify it for potential liability arising from alleged groundwater contamination. Although the appellate court did not discuss the facts of that case, the insured apparently hauled and stored waste oil in the course of its business.

The appellate court rejected the insurer's argument that the discharge was not sudden or accidental because it occurred over a period of time, as a result of the insured's ongoing business activity. Instead, the court held that "sudden" means "unexpected," and "accidental" means "unintended." *Id.* Since the court found the evidence did not indicate the insured expected or intended to contaminate the groundwater, the sudden and accidental exception to the pollution exclusion applied. The insurer was accordingly held liable.

Because I am convinced that the Michigan Supreme Court would not follow this aspect of *Polkow,* I decline to follow it here. In diversity cases, federal courts must apply state law in accordance with the decisions of the state's highest court. *Grantham and Mann v. American Safety Products,* 831 F.2d 596, 608 (6th Cir.1987) (citations omitted). If Michigan's Supreme Court has not addressed the issue, I should ascertain from all available data, including

the decisional law of Michigan's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the "majority" rule, what the Michigan Supreme Court would decide if faced with the issue. *Id.* (citations omitted).

A decision by the Michigan Court of Appeals is not controlling where the Michigan Supreme Court has not spoken. *Id., citing Commissioner v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). However, *Polkow* is datum for determining Michigan law, which I should not disregard unless convinced by other persuasive data that the Michigan Supreme Court would decide otherwise. *Id.* at 608–609 (citations omitted). *See also Dale Baker Oldsmobile v. Fiat Motors of North America,* 794 F.2d 213, 218 (6th Cir.1986). ("We are not bound by a decision of an intermediate appellate court when we are convinced that the highest state court would decide differently.")

I am persuaded that the Michigan Supreme Court would not follow *Polkow's* holding that "sudden" means "unexpected," and "accidental" means "unintended." [2] This holding is contrary to Michigan Supreme Court cases, the policy language, and the overwhelming weight of case law from other jurisdictions. *Polkow* rewrites the insurance contract by collapsing the definition of occurrence and the exception to the pollution exclusion, in effect removing the pollution exclusion.

As discussed above, the Michigan Supreme Court recently held that an "occurrence" takes place when the harm caused is unexpected and unintended from the subjective standpoint of the insured. *Allstate, id.,* 432 Mich. 656, 443 N.W.2d 734. An occurrence triggers liability coverage. The pollution exclusion precludes coverage for damage caused by pollution, even if an occurrence has triggered coverage. An exception to this pollution exclusion arises when the discharge of pollutants is sudden and accidental.

---

**2.** I have considered the option of certifying this issue to the Michigan Supreme Court. However, experience teaches that that court does not prefer to have questions come before it by certification.

By holding that the phrase "sudden and accidental" means "unexpected and unintended," *Polkow* erases the pollution exclusion. Coverage is still triggered when the harm was unexpected and unintended from the insured's standpoint, under *Allstate*. Pollution-related damage is still theoretically excluded from coverage. However, *Polkow* would then make an exception to the pollution exclusion if the contamination was unexpected and unintended from the insured's standpoint. The result of this circularity is that the only necessary inquiry is whether an occurrence took place.

*Polkow* is thus contrary to axiomatic canons of insurance policy interpretation established by the Michigan Supreme Court. The Court reiterated these canons in *Allstate:*

When examining the language of this or any other insurance policy, we are mindful of several other principles of construction so rudimentary as to be axiomatic:

The contract should be viewed as a whole.

The intent of the parties should be given effect.

An interpretation of the contract which would render it unreasonable should be avoided.

Meaning should be given to all terms.

Ambiguities should not be enforced.

Conflicts among clauses should be harmonized.

The contract should be viewed from the standpoint of the insured.

The insurer should bear the burden of proving an absence of coverage.

*Id.* at 722–723, 443 N.W.2d 734, *citing Fresard v. Michigan Millers Mutual Insurance Co.,* 414 Mich. 686, 327 N.W.2d 286 (1982).

*Polkow* failed to read the insurance policy as a whole, and to give meaning to all the policy's terms. *Polkow* did not discuss *Allstate* or the definition of occurrence. It focused only on two words within an exception to an exclusion, without considering the policy structure as a whole. It failed to give meaning to the pollution exclusion.

*Polkow* also interpreted the contract so as to make it unreasonable. The contract attempts to exclude liability for pollution-related damage. *Polkow* made this contract unreasonably broad by making the definition of occurrence coterminous with the exception to the pollution exclusion, and so eviscerating the exclusion. Given its recent *Allstate* decision, I am persuaded that the Michigan Supreme Court would not follow this portion of *Polkow.*

*Polkow* is not only contrary to Michigan Supreme Court authority, it is also contrary to the policy language itself. In describing the policy before it, *Polkow* said:

The policy further provides an exclusion for pollution-related damage unless "such *discharge, dispersal, release* or *escape* is sudden and accidental."

*Id.,* 180 Mich.App. 651, 447 N.W.2d at 855 (emphasis added). This language, like that in the case now before me, requires that the *discharge* of pollutants be sudden and accidental.

After reciting this language, however, the appellate court found the contamination, rather than the discharge, in its case was sudden and accidental. The appellate court stated:

There is nothing in this case to indicate that plaintiffs expected or intended to spill pollutants that would contaminate the soil or ground water. Whether or not the contamination detected by DNR ultimately is determined to be attributable to plaintiff does not matter. The essential allegation against plaintiff is that his business activities resulted in such contamination, and the evidence submitted below indicates without contradiction that the *contamination* was unexpected and unintended from his standpoint.

*Id.,* 180 Mich.App. 651, 447 N.W.2d at 856 (emphasis added). Contamination is the *harm* caused by the discharge, not the discharge itself. Because *Polkow* is at odds with the language of its policy, I am persuaded the Michigan Supreme Court would not follow it.

Finally, *Polkow*'s interpretation of the terms "sudden" and "accidental" is con-

trary to the weight of case law from other federal jurisdictions. In addition to *Polkow*, Ray cites *Claussen v. Aetna Casualty and Surety Co.*, 676 F.Supp. 1571 (S.D. Ga.1987), *question certified* 865 F.2d 1217 (11th Cir.1989), *certified question answered* 259 Ga. 333, 380 S.E.2d 686 (1989), *New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359 (D.Del. 1987), and *U.S. Fidelity and Guaranty Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139 (W.D.Mich.1988), to support its argument that "sudden and accidental" means "unexpected and unintended." I find these cases unpersuasive and contrary to the weight of case law.

*Claussen* and *New Castle County* reached similar results with similar reasoning. Both courts found the term "sudden" ambiguous. Therefore, they interpreted the term in the light most favorable to the insured, and concluded that "sudden" means unexpected and unintended.[3]

The United States Court of Appeals for the Sixth Circuit and many other courts have rejected this analysis. In *United States Fidelity and Guaranty Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988), the appeals court held the phrase "sudden and accidental" is not ambiguous. "We fully agree with the conclusion that this 'language is clear and plain, something only a lawyer's ingenuity could make ambiguous.'" *Id.* at 34 *citing American Motorists Insurance Co. v. General Host Corp.*, 667 F.Supp. 1423 (D.Kan.1987).

The appeals court then rejected the argument that "sudden and accidental" means "unexpected and unintended," stating:

> We believe that the phrase "sudden and accidental" is not a synonym for "unexpected and unintended", and that it should not be defined by reference to whether the accident or damages were expected. That precise argument has been rejected by numerous other courts and we join them today.

*Star Fire Coals, id.* at 34. Accordingly, I will not follow *Claussen* and *New Castle County*, as Ray suggests.

In addition to its contention that "sudden and accidental" means "unexpected and unintended," Ray argues that its releases were sudden and accidental because discrete releases occurred each time a barrel was smashed. It also argues the releases were accidental since Metamora's operators moved Sea Ray's drums to a separate burial site and did not anticipate the releases. Finally, Ray says the releases did not occur in the course of Sea Ray's business, but in the course of Metamora's business.

In contrast, Liberty argues the releases were not sudden and accidental because the dumping continued regularly over many years, as part of the regular course of Sea Ray's business. Liberty says such ongoing, repeated discharges are not sudden, even if the releases could be viewed as separate incidents. Liberty lastly claims the releases were not accidental, since they were continuous and many barrels were open when Sea Ray sent them to Metamora.

I find that because Sea Ray's discharges took place continuously and regularly for approximately thirteen years, they were not sudden and accidental. The pollution exclusion releases Liberty from its duty to *indemnify* Ray for liability for contamination which happened after July 1, 1971. I will discuss Liberty's duty to *defend* Ray after July 1, 1971 below.

A majority of federal courts addressing the question has found that discharges occurring over a number of years fall within the pollution exclusion, because the discharges were not sudden and accidental. *See, e.g., U.S. Fidelity and Guaranty Co. v. Murray Ohio Mfg.*, 693 F.Supp. 617, 622 (M.D.Tenn.1988) *aff'd* 875 F.2d 868 (6th Cir.1989) ("Simply put, an event that occurs over the course of six years logically cannot be said to be 'sudden.'"); *Detrex Chemical Industries v. Employers Insurance of Wausau*, 681 F.Supp. 438, 457 (N.D.Ohio 1987) ("Sudden and accidental" does not include injuries incurred over a period of time.); *Centennial Insurance Co. v. Lumbermens Mutual Casualty Co.*, 677 F.Supp. 342, 349 (E.D.Pa.1987) (The

---

3. *Polkow* did not address the ambiguity issue.

continuous disposal of pollutants in the regular course of business was not sudden.); *U.S. Fidelity and Guaranty Co. v. Korman Corp.*, 693 F.Supp. 253, 259–260 (E.D.Pa.1988) (Discharges occurring continually over a period of time are not sudden within the meaning of the pollution exclusion.); *American Motorists Insurance Co. v. General Host Corp.*, 667 F.Supp. 1423, 1428 (D.Kan.1987) (Salt pollution of an aquifer was not sudden where it happened gradually over an extended time.); and *Fischer & Porter Co. v. Liberty Mutual Insurance Co.*, 656 F.Supp. 132 (E.D.Pa. 1986).

In addition to these six cases, two federal judges of this district have held that the sudden and accidental exception to the pollution exclusion does not apply where discharges occurred regularly or continuously in the course of an insured's business. *American States Insurance Co. v. Maryland Casualty Co.*, 587 F.Supp. 1549, 1553 (E.D.Mich.1984) (The pollution exclusion was intended to exclude coverage for damages caused by the emission of pollutants as a regular or continuous part of the insured's business.); and *Grant–Southern Iron & Metal Co. v. CNA Insurance Co.*, 669 F.Supp. 798, 800 (E.D.Mich.1986) *dismissed* 838 F.2d 470 (1988) (Alleged pollution by a briquetting plant was not sudden because it was continuous and ongoing.).

The United States Court of Appeals for the Sixth Circuit joined this consensus in *Star Fire Coals, id.*, 856 F.2d 31. In that case, the defendant operated a coal tipple which discharged coal dust in the normal operation of its business on a routine, regular and continuous basis. Star Fire had taken various steps to control its dust emissions, without success. After rejecting Star Fire's argument that the policy language was ambiguous, the appeals court held the discharges were not sudden and accidental. The court said, "Thus, we believe that such pollution exclusion clauses apply to the release of wastes and pollutants taking place on a regular basis *or* in the ordinary course of business." *Id.* at 35. Because discharges are not sudden if they are regular, it does not matter in this case whether the releases were in the regu-

lar course of Sea Ray's or Metamora's operation.

The court in *New York v. Amro Realty Corp.*, 697 F.Supp. 99 (N.D.N.Y.1988), agreed with *Star Fire Coals*, and held that where a chemical release continues for more than twenty years, as part of a normal manufacturing process, the release is not sudden and accidental. *Id.* at 107, 110. The court reasoned, "[T]here is no use of the word 'sudden' which is consistent with events transpiring over a twenty-year period." *Id.* at 110.

I am persuaded that the Michigan Supreme Court would follow this line of cases, rather than *Polkow*. I find that because Ray's releases occurred regularly and continuously for approximately thirteen years, these releases were not sudden and accidental. The exception to the pollution exclusion does not apply here.

Contrary to Ray's argument, I find the regular, repeated discharge of pollutants is not sudden and accidental, despite the fact that the releases could also be viewed as a series of discrete events. In *Star Fire Coals*, the defendant discharged coal dust when it dropped crushed coal. The appeals court concluded the pollution exclusion applied to such individual releases because they took place on a regular basis. *Id.* at 35.

The court in *Centennial Insurance Co., id.*, 677 F.Supp. 342, 348–349 (E.D.Pa.1987), also explicitly rejected an insured's argument that where the insured hired a waste hauler to take its waste to a landfill, each individual release was sudden from the insured's point of view. The court found that at least three cases had already rejected the argument that a toxic discharge occurring continuously *or even sporadically* over a period of time may be sudden. *Id.* at 348. Therefore, I reject Ray's argument that I should view its releases as a series of discrete, sudden and accidental events. The releases were continuous, and regularly repeated over thirteen years, rather than sudden.

Ray's releases are also not accidental under *Star Fire Coals*. Ray argues its

**1320**

releases were accidental because the landfill operators tried to avoid them. The appeals court rejected a similar argument, holding in *Star Fire Coals* that the discharges were clearly not accidental, even though Star Fire had tried to control its emissions. Ray's releases are also not accidental, since Sea Ray sent many of its drums to the landfill without tops. I hold that the pollution exclusion precludes Liberty's duty to indemnify Ray, because its releases were not sudden or accidental.

■ My holding that Liberty need not indemnify Ray for contamination which happened after July 1, 1971 does not answer the question whether Liberty has a duty to defend Ray after that time. The duty to defend is separate from the duty to indemnify an insured. *State Farm and Fire Casualty Co. v. Huyghe*, 144 Mich. App. 341, 375 N.W.2d 442 (1985). The duty to defend is broader than the duty to indemnify or the limits of policy coverage. *Iacobelli Co. v. Western Casualty & Surety Co.*, 130 Mich.App. 255, 261, 343 N.W.2d 517 (1983). I find that although Liberty has no duty to indemnify Ray after the pollution exclusion took effect, its duty to defend continues until the underlying dispute between EPA and Ray is resolved.

Liberty has a duty to defend Ray against:

> any suit ... seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

*Statement of Stipulated Facts, supra* at 2. I have already held that Liberty's duty to defend was triggered by Ray's receipt of the PRP letter. The remaining issue is whether this duty continues despite my holding that Liberty has no duty to indemnify Ray after July 1, 1971. I hold that this duty to defend does continue.

Under the terms of the policies, Liberty must defend Ray against certain "suits." The "suit" in this case is between Ray and EPA. In the present declaratory judgment action, I have interpreted the terms of the policies issued by Liberty to Ray. This interpretation does not affect the underlying suit. Liberty's duty to defend Ray against the EPA suit is similarly not affected by this declaratory judgment. Liberty's duty to defend continues until the suit between Ray and EPA is resolved.

The duty to defend is determined by the allegations in the complaint against the insured. *Wright v. White Birch Park*, 118 Mich.App. 639, 643, 325 N.W.2d 524 (1982) *citing Guerdon Industries, Inc. v. Fidelity & Casualty Company of New York*, 371 Mich. 12, 123 N.W.2d 143 (1963). In this case, the PRP letter fulfills the function of a complaint.

In case of doubt about whether the complaint alleges a liability covered by the policy, the doubt is resolved in the insured's favor. *Allstate Insurance Co. v. Demps*, 133 Mich.App. 168, 178, 348 N.W.2d 720 (1984).

The declaratory judgment action now before me has not addressed EPA's allegations, nor should it. Where a declaratory judgment proceeding involves a liability insurer, that proceeding should deal only with questions of policy coverage, not the insured's liability to the injured party. 20 Appleman *Insurance Law and Practice* § 11335 at 274 (1980). Since the action before me has not addressed the scope of EPA's allegations against Ray, I have not reached the issue whether EPA alleged a liability covered by the policies. Liberty's duty to defend continues until these questions are resolved.

In summary, I conclude that Liberty's duty to defend Ray was triggered when Ray received its PRP letter. I also conclude that under the stipulated facts, a covered occurrence took place. I further conclude that the pollution exclusion releases Liberty from its duty to indemnify Ray for liability arising from contamination which occurred after July 1, 1971. However, Liberty's duty to defend Ray has not terminated, but continues until the underlying dispute between Ray and EPA is resolved. Accordingly, Ray's motion for summary judgment is GRANTED in part and DENIED in part. Liberty's motion for

summary judgment is also GRANTED in part and DENIED in part.

An appropriate order may be submitted.