ARCO INDUSTRIES CORPORATION v
AMERICAN MOTORISTS INSURANCE COMPANY

Docket Nos. 96782-96784. Argued November 1, 1994 (Calendar No. 4).
Decided April 18, 1995.

Arco Industries Corporation and others brought an action in the
Kalamazoo Circuit Court against American Motorists Insurance
Company (AMICO) and other Arco insurers, seeking a declara-
tion of AMICO's duty to defend and indemnify Arco for costs
incurred in defending an underlying action brought by the
Department of Natural Resources against Arco to remedy
chemical contamination at Arco's manufacturing plant. Follow-
ing a bench trial, the court, William G. Schma, J., ordered
AMICO to indemnify Arco, finding that Arco had not expected or
intended to harm the environment. The Court of Appeals,
MICHAEL J. KELLY, P.J., and MacKENZIE and BRENNAN, JJ.,
reversed, holding that Arco did so expect or intend (Docket
Nos. 133908, 135893, 136612). The plaintiffs appeal.

In an opinion by Justice MALLETT, joined by Chief Justice
BRICKLEY, and Justices LEVIN and CAVANAGH, the Supreme
Court *held:*

The Court of Appeals failed to apply the correct legal stan-
dard in determining whether Arco expected or intended con-
tamination of the environment. It should have applied a subjec-
tive, rather than an objective, standard of review. Furthermore,
the Court erred in reversing the trial court's findings of fact
and wholly ignored the trial court's evaluation of evidence
presented at trial. On the basis of the trial court's evaluation of
the evidence and review on this appeal, Arco and its employees
did not intend or expect to contaminate the environment.
Because the Court of Appeals did not reach the duty to defend
issues raised by Arco in its cross appeal, remand is required for
further proceedings.

1. According to the plain meaning of the applicable AMICO
comprehensive general liability policy, coverage clearly and
unambiguously exists only where there has been an occurrence,
defined as an accident, including injurious exposure to condi-
tions, that results, during the policy period, in bodily injury or
property damage neither expected nor intended from the stand-
point of the insured. Thus, AMICO is required to indemnify Arco

in situations in which an accident occurred that was neither expected nor intended from the standpoint of Arco. Although the term "accident" is not defined in the AMICO policy, according to the common meaning of the term, case law has held that an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected. Case law has also held that the definition of accident should be viewed from the standpoint of the insured, in this case, Arco. The trial court found that there were definitely unintentional, accidental releases of contaminants, and this finding was fully supported by the evidence presented.

2. Case law has further held that in determining whether an insurer has a duty to defend or indemnify an insured the proper standard of review is subjective, not objective. The Court of Appeals erred when it applied an objective standard. The language "should have known" is a purely objective test that was previously rejected by the Supreme Court, and should not have been used by the Court of Appeals in this case. Such language implies that, regardless of actual intent, Arco could be denied coverage if it objectively "should have known" that harm was substantially likely to result from its actions. The Court should have analyzed whether Arco's conduct, from Arco's perspective, evidenced an intent to cause contamination to the environment, and whether Arco had the awareness that harm was likely to follow from its actions. So analyzed, Arco and its employees did not intend or expect to contaminate the environment.

Justice BOYLE, concurring, stated that a two-step inquiry into whether there was an "accident" and whether damages were "intended or expected" when evaluating incidents under the standard terms of the policy at issue is unnecessarily duplicative. In the context of such a policy, the only analysis necessary should be whether the damages were intended or expected from the standpoint of the insured. That inquiry sufficiently encompasses the threshold determination of "accident" and properly places the burden of proof regarding coverage on the insured.

Where a comprehensive general liability policy that includes within its definition of a covered occurrence the requirement that there be an accident and that damage be neither intended nor expected from the standpoint of the insured, the only issue in determining if coverage exists, other than whether damage occurred during the policy period, is whether the insured has fulfilled the burden of proving that it neither subjectively expected nor intended the damage. When the insureds are

commercial parties, this analysis normally will focus on the insureds' expectation of damage. In this case, there was insufficient evidence to question the trial court's finding that the insureds neither expected nor intended property damage during the entire period covered by the policies issued by Arco.

Reversed in part and remanded.

Justice RILEY, dissenting, stated that the dispositive issue in this case is whether Arco intended or expected to contaminate the environment through its actions during 1968 through 1974, when AMICO insured it. Because Arco did not intend or expect to harm the environment from 1968 until 1972, AMICO should be held liable for the damages that occurred during those years. However, from 1972 through 1974, Arco knew that volatile organic compounds deliberately were being placed into the drainage ditches that led to its lagoon. It also knew that these VOCS posed a danger to the environment and that its actions would cause serious environmental harm. As a result, the damage that occurred from 1972 until 1974 was expected by Arco and was not an accident. Thus, an occurrence within the definition of the insurance policy never happened, and AMICO's liability never arose.

Justice WEAVER took no part in the decision of this case.

198 Mich App 347; 497 NW2d 190 (1993) reversed in part.

*Honigman, Miller, Schwartz & Cohn* (by *Jay E. Brant, Philip A. Grashoff, Jr., Mark A. Goldsmith,* and *Daniel G. Helton*), and *Butler, Durham & Svikis* (by *Sidney D. Durham* and *Andis Svikis*) for the plaintiffs.

*Miller, Canfield, Paddock & Stone* (by *Kevin J. Moody* and *Clifford T. Flood*), and *Drinker, Biddle & Reath* (by *T. Andrew Culbert* and *Paul H. Saint-Antoine*) for the defendant.

Amici Curiae:

*Harwood, Lloyd* (by *Edward Zampino, Peter E. Mueller,* and *Victor C. Harwood, III*), and *Vandeveer, Garzia* (by *Charles W. Browning,* and *Alison L. Thorburn*) for Aetna Casualty & Surety Company.

*Richard Halprin; Anderson, Kill, Olick & Oshinsky, P.C.,* of counsel (by *Eugene R. Anderson, Bennett Ellenbogen,* and *Sarah B. Hechtman*), and *Martha Churchill,* General Counsel, for Mid-America Legal Foundation.

*Warner, Norcross & Judd* (by *Paul T. Sorensen*) and *Covington & Burling* (by *Gregg H. Levy, Eric C. Bosset,* and *Stacey L. Dogan*) for Masco Corporation, Dow Corning Corporation, Dow Chemical Company, and the Upjohn Company.

*Stephen M. Kelley; Wiley, Rein & Fielding,* of counsel (by *Laura A. Foggan, John E. Barry,* and *William A. McGrath*), for Insurance Environmental Litigation Association.

MALLETT, J. We granted leave in this case to determine whether an insurance company, American Motorists Insurance Company (AMICO), has the duty to indemnify its insureds, Arco Industries Corporation and Frederick C. Matthaei, Jr.,[1] for costs it incurred in defending an action brought by the Department of Natural Resources to compel Arco to remedy chemical contamination at its manufacturing plant. Specifically, we must determine whether the chemical contamination at Arco's plant between 1968 and 1974 was "expected or intended from the standpoint" of the insured.

At the conclusion of a bench trial before Kalamazoo Circuit Court Judge William Schma, AMICO was ordered to indemnify Arco. The circuit court found that the insurance company was liable because Arco had not expected or intended to harm the environment as a result of its manufacturing process. AMICO appealed, and the Court of Appeals

[1] Frederick C. Matthaei, Jr., is Arco's majority shareholder and chairman of its board.

reversed holding that Arco expected or intended to contaminate the environment. 198 Mich App 347; 497 NW2d 190 (1993).

We hold that the Court of Appeals failed to apply the correct legal standard in determining whether Arco expected or intended the contamination. The Court of Appeals should have applied a subjective, rather than an objective, standard of review. Furthermore, we hold that the Court of Appeals erred in reversing the trial court's findings of fact. The Court of Appeals wrongly disregarded the trial court's evaluation of evidence presented at trial. Lastly, we remand the duty to defend issues to the Court of Appeals for further consideration. Accordingly, we reverse in part, and remand for further proceedings, in favor of Arco. We do not retain jurisdiction.

I

Plaintiff Arco Industries Corporation is a small automotive parts manufacturer that has operated a manufacturing plant in Schoolcraft, Michigan, since 1967. As part of the manufacturing process, the automotive parts are dipped into liquid plastisol or vinyl. Volatile organic compounds (VOCs) such as perchloroethylene, trichloroethylene, 1-2 dichloroethylene and vinyl chloride, were used to clean the parts during the manufacturing process and to remove plastisol from the plant floors. The plant floor was designed with a trench drain system that drained waste from the plant floor into an unlined seepage lagoon located in the back of the plant. As a result, VOCs contaminated the seepage lagoon and ground water.

In November, 1985, the Department of Natural Resources notified Arco that the seepage lagoon was contaminated with VOCs, and records indicated

that Arco was the source of the contamination.
After Arco's failure to resolve the problem, the
DNR filed suit against Arco in federal court in an
attempt to compel Arco to remedy the VOC contam-
ination and collect claimed response costs.[2] Subse-
quently, the State of Michigan and Arco entered
into a consent decree whereby Arco agreed to pay
the state $450,000 in response costs together with
attorney fees. Arco also agreed to develop and
implement a multimillion dollar ground water and
soil remediation program.

Arco's insurer, AMICO, refused to defend or in-
demnify in the underlying litigation alleging that
the insurance contract did not cover this type of
incident. As a result, on February 4, 1987, Arco
filed suit against AMICO, seeking to compel the
insurer to honor its contractual obligations. In
response to the suit, AMICO's defense was that this
type of incident was not a covered "occurrence"
within the meaning of the applicable comprehen-
sive liability policies because Arco either expected
or intended the pollution that resulted from its
manufacturing process.

The trial court found that the contamination
was not anticipated by Arco, and that there was
no "showing that there was an intention by any-
one to contaminate." Thus, on September 28,
1990, a judgment was entered compelling AMICO to
pay its allocated share (68.63 percent) of all indem-
nifiable losses up to the aggregate limits of AMICO's
coverage of $3.5 million.

The Court of Appeals, however, reversed the
trial court's decision and held that AMICO did not
have the responsibility to defend or indemnify
Arco. The Court held that there were clearly
intentional discharges of VOCs by Arco employees

[2] *Attorney General ex rel Dep't of Natural Resources v Arco Indus-
tries Corp*, No. K87-372-CA4 (WD Mich, 1987).

and Arco either should have foreseen the result of the intentional acts, knew, or should have known that such practices would result in a substantial probability that vocs would contaminate the soil and ground water. 198 Mich App 352-353.

This conclusion was based on the following:

> Defendant presented the testimony of numerous former Arco employees who testified that they had intentionally dumped or squeegeed vocs into the drains that led to the seepage lagoon. Several of these former employees also testified that they had observed other Arco employees doing the same. One of plaintiffs' witnesses testified that he observed an Arco employee deliberately dump 150 to 165 gallons of vocs directly onto the bare ground behind the plant. This witness also testified that he observed an Arco employee deliberately dumping vocs into the drains. Former Arco employees also testified that vocs were used to mop the plant floors from at least 1964 to 1979. The mopping was often performed on and around the drains that led directly to the unlined lagoons. Given the frequency and volume of mopping required to clean the plant floors, some of the vocs would invariably go into the drains and be washed into the lagoons. Furthermore, plaintiffs' expert testified that during the manufacturing process, vocs were discharged into the lagoon during defendant's coverage period. Additionally, Arco's plant chemist testified that he knew at the time he began employment with Arco in 1972 that vocs should not be discharged into the unlined lagoon because they would degrade the environment. [*Id.* at 352.]

We hold that the Court of Appeals applied an incorrect legal standard in determining whether Arco intended or expected to contaminate the environment. The trial court properly found that Arco's employees did not intentionally release vocs with the subjective intent or expectation to

harm the environment. The Court of Appeals erred in ignoring the trial court's findings of fact with respect to this issue. Because the Court of Appeals did not reach the duty to defend issues, we remand these issues to the Court of Appeals for consideration. Accordingly, we reverse in part, and remand for further proceedings.

II

Initially, in determining whether AMICO must indemnify Arco, we must look to the language of the insurance policy and interpret the terms in accordance with the well-established Michigan principles of construction. *Michigan Millers Mutual Ins Co v Bronson Plating Co,* 445 Mich 558, 567; 519 NW2d 864 (1994).

First, an insurance policy must be enforced in accordance with its terms. *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 207; 476 NW2d 392 (1991). We will not hold an insurance company liable for a risk it did not assume. *Auto-Owners Ins Co v Churchman,* 440 Mich 560, 567; 489 NW2d 431 (1991); *Kaczmarck v La Perriere,* 337 Mich 500; 60 NW2d 327 (1953).

Second, we cannot create ambiguity where the terms of the contract are clear. *Churchman, supra* at 567; *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656, 666; 443 NW2d 734 (1989), reh den with addenda to opinion 433 Mich 1202; 446 NW2d 291, (1989), citing *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co,* 375 Mich 598; 134 NW2d 746 (1965); *Patek v Aetna Life Ins Co,* 362 Mich 292; 106 NW2d 828 (1961); *Dimambro-Northend Associates v United Construction, Inc,* 154 Mich App 306, 313; 397 NW2d 547 (1986); *Farm Bureau Mutual Ins Co v Hoag,* 136 Mich App 326, 332; 356 NW2d 630 (1984).

Where there is no ambiguity, we will enforce the terms of the contract as written. *Stine v Continental Casualty Co,* 419 Mich 89, 114; 349 NW2d 127 (1984); *Murphy v Seed-Roberts Agency, Inc,* 79 Mich App 1, 7-9; 261 NW2d 198 (1977). However, where an ambiguity exists, this Court will construe the policy in favor of the insured. *Auto Club Ins Ass'n v DeLaGarza,* 433 Mich 208, 214; 444 NW2d 803 (1989); *Powers v DAIIE,* 427 Mich 602, 624; 398 NW2d 411 (1986).

Furthermore, this Court must interpret the terms of the contract in accordance with their "commonly used meaning," *Group Ins Co of Michigan v Czopek,* 440 Mich 590, 596; 489 NW2d 444 (1992); *Fireman's Fund Ins Cos v Ex-Cell-O Corp,* 702 F Supp 1317, 1323, n 7 (ED Mich, 1988), and must take into account the reasonable expectations of the parties. *Vanguard Ins Co v Clarke,* 438 Mich 463, 472; 475 NW2d 48 (1991).

According to the plain meaning of the applicable AMICO comprehensive general liability policy, coverage only exists where an occurrence has taken place. The relevant portion of the policy provides:

> [AMICO] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . caused by an *occurrence,* and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements. [Emphasis added.]

The term "occurrence" is defined as follows:

> [An] accident, including injurious exposure to
> conditions, which results, during the policy period,
> in bodily injury or property damage neither *ex-*
> *pected nor intended from the standpoint of the*
> *insured.* [Emphasis added.]

We find that this policy language is clear and
unambiguous, *Jones v Farm Bureau Mutual Ins*
*Co,* 172 Mich App 24; 431 NW2d 242 (1988), inso-
far as AMICO is required to indemnify Arco in
situations where an accident occurred that was
"neither expected nor intended from the stand-
point" of Arco. To this extent, we will enforce the
policy as written. *Eghotz v Creech,* 365 Mich 527,
530; 113 NW2d 815 (1962). However, whether
there was an "accident" and whether Arco "ex-
pected or intended" the contamination remain in
dispute. This is where we next turn our attention.

III

In recent times, there has been controversy over
interpreting the term "accident." "Accident" has
been difficult to interpret because it is sometimes
not defined in insurance policies. See also *Auto*
*Club Group Ins Co v Marzonie,* 447 Mich 624; 527
NW2d 760 (1994). When the meaning of a term is
not obvious from the policy language, the "com-
monly used meaning" controls. *Czopek, supra* at
596.

In the instant case, the term "accident" is not
defined by the AMICO policy. However, according to
the common meaning of the term, it has been
stated in *DiCicco* at 670, and *Marzonie* at 631-632,
that " 'an accident is an undesigned contingency, a
casualty, a happening by chance, something out of
the usual course of things, unusual, fortuitous, not

anticipated, and not naturally to be expected.' "
This definition is not disputed in the instant case.
What is disputed is whether the definition of acci-
dent should be viewed from the standpoint of the
insured or the injured party.

This Court has debated this issue in a number of
previous cases. See *Frankenmuth Mutual Ins Co v
Piccard,* 440 Mich 539; 489 NW2d 422 (1992),[3]
*Czopek,*[4] and *Marzonie, supra.* In *Marzonie,* this
Court finally formed a majority on this issue hold-
ing that "accidents" are evaluated from the stand-
point of the insured, not the injured person. See
opinions of Justices LEVIN, BRICKLEY, and GRIFFIN,
and Chief Justice CAVANAGH.

Thus, in the instant case, we evaluate the acci-
dent from the standpoint of Arco, not the state.
The trial court found that there were definitely
unintentional, accidental releases of VOCs, and we
hold that this was fully supported by the evidence
presented. The trial court found:

> It was clear that there were accidents occurring
> throughout the period of the policies at issue.
> There were accidental spills, according to the testi-
> mony, which resulted in discharges into the drains
> in the plant, as well as unintentional overflows
> into the drains in the plant. The evidence supports
> finding that the voc's which were released, en-
> tered the soil in all three areas described on the
> exhibits, that they entered the aquifer and contrib-
> uted to the plume.

---

[3] In *Piccard,* Justice RILEY, joined by Justices BRICKLEY and
MALLETT, held that an "accident" should be analyzed from the stand-
point of the injured party. Although Justice LEVIN concurred only in
the result, he has recently opined that "accidents" should be viewed
from the standpoint of the insured. See *Marzonie, supra* at 651-652
(LEVIN, J., dissenting).

[4] Although the issue of "accidents" did not arise in *Czopek* as it
does here, Justice BOYLE stated that where the policy language does
not specify the perspective to be applied when determining if there
was an accident, the accident must be viewed from the perspective of
the injured party. *Czopek, supra* at 608-612.

This finding was on the basis of numerous facts including the following:

1. Arco's laborer, James Stout, testified that throughout the 1967-72 period, there were several accidental spills of mop buckets containing four to five gallons of solvents, most of which went into the drain system leading to the seepage pond.
2. Mr. Stout also testified that sometime between 1969 and 1971, he observed a forklift operator accidentally puncture a drum of solvents, most of which ran off onto the ground.
3. An Arco maintenance supervisor, Wesley Tomsheck, testified that between 1974 and 1984, he witnessed ten to twenty spills within the Arco plant when drums accidentally tipped over as they were being transported, resulting in several gallons going into the drain on at least half of the occasions.
4. Mr. Tomsheck also testified that in 1974, he found five or six drums leaking in back of the Arco plant that had been punctured by forklifts or shot by hunters.
5. Mr. Tomsheck further testified that in 1974, he witnessed a spill of five or six gallons of solvent when solvents were being transferred from a drum to a holding tank.
6. An AMICO witness, Ruth Kelly, testified that she saw an accidental spill in 1970 when a drum of solvent was being transported in the plant. The drum was full and most of the contents went into the drain.

These incidences indicate that the spills were

unintentional and constituted accidents. There is ample evidence establishing that they were an undesigned contingency, not anticipated, and not naturally to be expected. *DiCicco* at 670; *Marzonie* at 631-632. Each of these facts is fully supported by the record.

IV

Upon finding that there were "accidents," we next turn to the issue whether Arco intended or expected to contaminate the environment.

The standard of review used in determining whether an insurance policy provides coverage was fully debated and decided in *Metropolitan Property & Liability Ins Co v DiCicco, supra.* In *DiCicco,* this Court held that the proper standard of review was subjective, not objective, when determining whether an insurer has a duty to defend or indemnify an insured under the provision of a homeowner's policy.

*DiCicco* involved whether there was coverage for an assault where the policy excluded coverage for " '[b]odily injury or property damage which is either expected or intended from the standpoint of the insured.' " *Id.* at 708. This language is very similar to that found in the instant case.[5] In

---

[5] The policy language in *Allstate Ins Co v Freeman,* decided with *DiCicco, supra,* however, contained different language. In fact, the *Freeman* policy did not contain an "occurrence" definition, but only included an exclusionary clause for intentional acts. The Allstate policy provided:

"Exclusions—Losses We Do Not Cover
"1. We do not cover any bodily injury or property damage which *may reasonably be expected* to result from the intentional or criminal acts of an insured person or which is in fact intended by an insured person." [*Id.* at 685. Emphasis added.]

This Court interpreted the inclusion of the language "may reasonably be expected," to permit the inference of an objective standard of

*DiCicco,* the defendant, David DiCicco, stabbed James Gravenmier, which resulted in Gravenmier bringing an action seeking damages for his injuries. DiCicco was an insured under a homeowner's policy issued to his father by Metropolitan Property and Liability Insurance Company. Metropolitan filed suit, seeking a declaration that the policy did not cover the stabbing incident because DiCicco either intended or expected to injure Gravenmier.

In *DiCicco,* the Court held[6] that the policy language required application of a subjective standard to determine whether the insured intended the harm, in the absence of explicit policy language to the contrary. Justice BOYLE, writing the lead opinion, stated:

> I do not believe that a fair reading of the Metropolitan exclusion would support an objective standard and therefore conclude that the policy language is unambiguously subjective. . . . To apply the exclusion in its plain and easily understood sense, we need only determine whether Gravenmier's injury was either expected or intended from the standpoint of DiCicco. [*Id.* at 709-710.]

Chief Justice RILEY, joined by Justice GRIFFIN, on the other hand, dissented, stating that the proper standard was objective or, rather, whether the insured "*knew or should have known* that there was a substantial probability that certain consequences will result from his actions." 432 Mich 675 (emphasis provided). Although both the

review. See also *Buczkowski v Allstate Ins Co,* 447 Mich 669; 526 NW2d 589 (1994). Unlike the language in the policies at issue in *Freeman* and *Buczkowski,* the language in the instant policy does not include the phrase "may reasonably be expected."

6 Justices LEVIN, CAVANAGH and ARCHER, concurred with Justices BOYLE and BRICKLEY. Chief Justice RILEY and Justice GRIFFIN dissented.

majority and dissent in *DiCicco* offered persuasive arguments, our task in the instant case is not to reargue the issue, but to apply the rule espoused by the majority.

It is apparent that the Court of Appeals did not consider this Court's holdings in *DiCicco, supra.* The Court of Appeals clearly applied an objective standard when it used binding language such as "knew or should have known." *Id.* The language "should have known" is a purely objective test that was rejected by this Court in *DiCicco* and should not have been used by the Court of Appeals in the instant case. Such language implies that regardless of actual intent, Arco could be denied coverage if it objectively "should have known" that harm was substantially likely to result from its actions.

The Court of Appeals stated that information that the plant chemist, Ed Koperdak, had regarding the dangers of VOCs illustrates that Arco "should have known" of the potential harm to the environment. However, merely because Arco may have had the knowledge that VOCs were dangerous to the environment does not prove that Arco had the "awareness that harm was likely to follow from the performance of [its] intentional acts." *Piccard, supra* at 550. Mere knowledge of potential danger does not equal knowledge of actual, intentional, expected harm. Further, the Court of Appeals erred when it ignored the trial court's finding of fact that Arco and its employees did not intend to harm the environment. We hold that the Court of Appeals analysis focused on a purely objective standard failing to properly apply the subjective standard mandated by this Court. *DiCicco, supra.*

Thus, two conclusions may be made regarding the analysis of this case. First, the Court of Ap-

peals should have analyzed whether Arco's conduct, from the perspective of Arco, evidenced an intent to cause the contamination to the environment. Second, the Court of Appeals should have analyzed whether Arco had the awareness that harm was likely to follow from the performance of its actions. *Piccard, supra* at 550-551. We now review the evidence in the context of the proper standard of review.

v

It is well established that an appellate court is not to substitute its own judgment for that of the trial court unless the facts "clearly preponderate in the opposite direction." *Ins Co of North America v Schuneman,* 373 Mich 394, 397; 129 NW2d 403 (1964).

Pursuant to MCR 2.613(C):

Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.

With respect to reviewing the credibility of witnesses,

appellate courts should give special deference to the trial court's findings when they are based upon its assessment of the witnesses' credibility. [*Schultes Real Estate Co v Curis,* 169 Mich App 378, 385-386; 425 NW2d 559 (1988).]

See also MCR 2.614(C).

Reversal is permitted only if the appellate court is left with a "definite and firm conviction that a mistake has been committed" by the lower court.

*Balwinski v Bay City,* 168 Mich App 766, 769-770; 425 NW2d 218 (1988).

After a two and a half week trial, the trial court found that (1) there was no evidence of any intent to harm the environment,[7] and (2) there were numerous unintentional releases of VOCs over the seven years of AMICO coverage.[8] These findings were based on an evaluation of the evidence presented and the trial court's evaluation of the credibility of the witnesses. The Court of Appeals misapplied these findings made by the trial court and, therefore, erred in reversing the determination that neither Arco nor its employees expected or intended to harm the environment. A review of the evidence presented at trial illustrates that the Court of Appeals erred in substituting its judg-

[7] Judge Schma stated:

> Significantly, there's been, I don't believe from the evidence, any showing that there was an intention by anyone to contaminate. I don't believe that the, even deliberate acts of releasing a contaminate [sic] is sufficient to impose liability on the party who is responsible for the discharge. In other words, a showing of the intent to contaminate is required, and that awareness doesn't exist . . . .
>
> \*   \*   \*
>
> [A] sudden discharge is one which is unexpected and an accident; is an event which is unintended; and there's been no showing, as I have suggested here, that it was otherwise than that. In fact, the testimony is specific, I believe, from every witness who mentioned that point, that the result was not intended and it was not expected.

[8] Judge Schma further stated:

> It was clear that there were accidents occurring throughout the period of the policies at issue. There were accidental spills, according to the testimony, which resulted in discharges into the drains in the plant, as well as unintentional overflows into the drains in the plant. The evidence supports finding that the VOC's which were released, entered the soil in all three areas described on the exhibits, that they entered the aquifer and contributed to the plume.

ment for that of the trial court, because the facts clearly did not "preponderate in the opposite direction." *Schuneman, supra* at 397.

The trial court found as a matter of fact that "the voc contamination was not anticipated by the insured" and that there was no "intention by anyone to contaminate." The facts from the trial record include the following:

1. The DNR's critical materials list did not list vocs as a material of concern before 1978.
2. The Water Quality Division of Michigan collected water samples from Arco's seepage lagoon as late as 1978 and found no evidence of voc contamination.
3. Arco's chairman of the board, Mr. Matthaei, did not become aware of any voc contamination until 1985.
4. Arco's president, Robert Ferguson, did not become aware of any voc contamination until 1985.
5. There were no Arco employees who testified that they intended or expected to harm the environment.[9]
6. Arco's plant chemist, Ed Koperdak, did not know of any voc contamination at the Arco facility as late as 1978.

These facts developed by the trial court show that although there may have been some seepage

---

[9] Judge Schma stated:

There simply is no proof that the significant testimony that contamination was not expected or intended, and that the extent of contamination was unknown with respect to vocs during the periods in question. There is no testimony that that was false or that any of these witnesses' lied.

of VOCS, Arco employees did not intend or expect to contaminate the environment. Furthermore, these facts do not prove that there was "awareness that harm was likely to follow from the performance of . . . intentional act[s]." *Piccard, supra* at 550. The Court of Appeals did not address these findings of facts, and instead relied on a single statement made by Arco's chemist, Ed Koperdak. The Court stated:

> Arco's plant chemist testified that he knew at the time he began employment with Arco *in 1972* that VOCS should not be discharged into the unlined lagoon because they would degrade the environment. [198 Mich App 352.]

Thus, the testimony on which the Court focused is not relevant for the four years before 1972. Arco was covered by numerous insurance policies throughout its existence in the manufacturing business. AMICO covered Arco between the years 1968 through 1974. Thus, even if the Court of Appeals found that Mr. Koperdak knew of the dangers of releasing VOCS into the environment, this knowledge would only be relevant for the years between 1972 and 1974.

However, Mr. Koperdak testified that when he joined Arco in 1972, he only knew that the VOCS should not be discharged into the lagoon because of possible contamination.[10] Certainly, a man with the education of Mr. Koperdak would know that

---

[10] *Q.* You understood, did you not, when you came to Arco that it was important that volatile organic compounds not be discharged in the seepage lagoon, correct?

*A.* Yes.

*Q.* And you knew that . . . if those volatile organic compounds were discharged into the seepage lagoon they could degrade the environment; isn't that correct?

*A.* Yes.

VOCS harm the environment.[11] However, Mr. Koperdak *never* testified that he knew that discharges of VOCS were going into the lagoon. He did not testify that he knew that employees of Arco were intending or expecting to harm the environment.

Mr. Koperdak wrote a memorandum dated July 28, 1981,[12] which was essentially a safety

---

[11] Mr. Koperdak received a Bachelor of Science in Chemistry from Youngstown University, Youngstown, Ohio, and has myriad experiences as a corporate consultant. Mr. Koperdak has conferred with corporations regarding rubber and plastics, industrial health and safety, and general environmental matters. He is also a part-time instructor at Kalamazoo Valley Community College.

[12] *Q.* To you, the purpose of this memorandum was to insure, was it not, that particular compounds didn't make their way into the Arco pond; is that correct?

*A.* Yes.

*Q.* It wasn't because you were worried about—this wasn't primarily designed out of a concern for accidents within the plant that might harm employees; is that correct?

*A.* Yes.

*Q.* So your concern about ammonia was also—or your primary, key concern with ammonia was it getting into the drains and getting into the pond?

*A.* One of the concerns, yes.

*Q.* And your concern with solvents was solvents getting into the drains and getting to the pond?

*A.* Yes.

\*    \*    \*

*Q.* In other words, when you came out with this memorandum you had never heard from anyone or had any knowledge of employees dumping any of these compounds in the drains?

*A.* No.

\*    \*    \*

*Q.* Did you also send around memos telling employees not to break windows or tip over machines, even though that had never occurred in the past?

*A.* No.

*Q.* But you did here, didn't you. Something that never occurred in the past, according to you or pursuant to your belief, you sent around a memo telling them not to do it?

*A.* That's taking it out of context. This was a safety procedure that I wrote.

*Q.* Wasn't there a procedure in effect throughout the time you were at Arco indicating employees shouldn't dump solvents into the drains?

*A.* Not in writing.

procedure guideline. During the testimony regarding this memorandum, Mr. Koperdak unequivocally stated that he knew of the harmful nature of VOCs. However, this testimony also unequivocally shows that as late as 1981, Mr. Koperdak was not aware that VOCs were being discharged into the environment. As late as 1981, Mr. Koperdak had never heard from anyone or had any knowledge that employees were dumping VOCs deliberately into the drains with the intent or expectation to harm the environment.

Mr. Koperdak's statements only show that he theoretically knew that VOC seepage could harm the environment, not that Arco was actually doing so. Thus, regardless of when Mr. Koperdak started his employment with Arco, his statements do not prove that Arco or its employees had the intent or expectation to harm the environment.

The facts also do not prove that Mr. Koperdak's awareness of the dangers of VOCs would lead him to know or expect that harm was likely to follow from certain actions. *Piccard, supra* at 549-550. Without the knowledge of the intentional acts, there could not have been an intent to harm the environment. Although it is tempting to infer intention or an awareness of the dangers of VOCs, there simply was no testimony that any of Arco's employees released VOCs into the environment with the intention to harm the environment. Furthermore, there was no testimony that anyone should have expected that harm would result from their actions. We will not make such inferential leaps.

*Q.* It was not in writing but wasn't there one?
*A.* Yes.
*Q.* How was that communicated to the employees?
*A.* Through the foremen.

Lastly, the Court of Appeals erroneously found that Arco had intentionally caused releases of vocs at the plant site, holding that "there were intentional discharges of vocs by Arco employees, which eventually migrated into the ground water . . . ." 198 Mich App 352. Because the trial court found that there was no intention or expectation to harm the environment, and because this Court has affirmed that ruling, the issue whether there were intentional releases of vocs is irrelevant.

Intentional releases of vocs without an intent to harm the environment does not establish the lack of an "occurrence." As stated in *Piccard, supra* at 548-549, there may be an "occurrence" even though the insured committed intentional acts.

[I]t is possible to have a cause of action where the intentional conduct will result in unintended and unexpected injury thus constituting an "accident" under the policy language.

In *Piccard,* the insured intentionally set fire to his building. As a result, the building was destroyed and a fireman was injured. This Court held that the intentional act of setting the fire could still be defined as an "occurrence" as long as the act was not committed with the intention or expectation that the injury to the fireman would occur. *Id.* at 553. Similarly, in the instant case, even though the act of introducing vocs into the environment may have been intentional, there was no evidentiary support establishing that the acts were intended or expected to harm the environment.[13]

Thus, regardless of whether the Court of Appeals found that there were intentional discharges of vocs by Arco employees, there was no evidence presented establishing that the intentional dis-

[13] See n 2.

charges were intended or expected to harm the environment.[14] Accordingly, we reverse.

VI

Arco has raised additional issues concerning the duty to defend. More specifically, Arco claims that the Court of Appeals overlooked several duty to defend issues including the following:

[1. Whether Arco was] entitled to be reimbursed for defense costs from the date of the MDNR demand letter.[15]

[2. Whether Arco] was entitled to be reimbursed fully for the fees charged by its counsel, rather than at the substantially lower rates awarded by the lower court.

[3. Whether Arco was entitled to a] reversal of the lower court's denial of relief for AMICO's bad faith breach of its duty to defend and for interest.

Arco speculates that the Court of Appeals mistakenly believed that its disposition of the first two issues in this action mooted these duty to defend issues. Arco believes that this alleged determination by the Court of Appeals would have violated the rule of law that states that "the duty to defend is broader than the duty to indemnify . . . ." *Polkow v Citizens Ins Co of America,* 438 Mich 174, 180; 476 NW2d 382 (1991). See also *DiCicco, supra*

---

[14] Because we have found that Arco's employees did not intend or expect to harm the environment, we need not discuss imputation of an employee's knowledge to the corporation in accordance with *Upjohn Co v New Hampshire Ins Co, supra.*

[15] This Court has recently addressed this issue in *Michigan Millers Mutual Ins Co v Bronson Plating Co, supra.* We held that receipt of a demand letter "constitute[s] the initiation of a 'suit' that the insurers [are] obliged to defend under the terms of their insurance policies." *Id.* at 575. Although we decline to formally address this issue in the instant case, we expect that *Bronson Plating* will lend guidance to the Court of Appeals on remand.

at 701-704. In other words, Arco argues that it is possible for AMICO to have a duty to defend, but, in the same instance, may not have a duty to indemnify Arco in the event that Arco requested reimbursement at the end of the suit.

The Court of Appeals did not reach these issues, and we refuse to speculate why the Court of Appeals failed to do so. Therefore, we remand these issues to the Court of Appeals for consideration. We do not retain jurisdiction.

### CONCLUSION

We conclude that the Court of Appeals failed to apply the correct legal standard in determining whether Arco expected or intended contamination of the environment. The Court of Appeals should have applied a subjective, rather than an objective, standard of review in accordance with *DiCicco, supra.*

Furthermore, we hold that the Court of Appeals erred in reversing the trial court's findings of fact and wholly ignored the trial court's evaluation of evidence presented at trial. On the basis of the trial court's evaluation of the evidence and our review of that evidence, we find that Arco and its employees did not intend or expect to contaminate the environment.

Lastly, because the Court of Appeals did not reach the duty to defend issues raised by Arco in its cross appeal, we remand this issue to the Court of Appeals for consideration.

Accordingly, we reverse in part, and remand for further proceedings. We do not retain jurisdiction.

BRICKLEY, C.J., and LEVIN and CAVANAGH, JJ., concurred with MALLETT, J.

BOYLE, J. (*concurring*). I agree with the majority

that the Court of Appeals improperly applied an objective standard of review in determining whether plaintiffs expected or intended the property damage that resulted from Arco Industries Corporation's use of volatile organic compounds (VOCS), and therefore should be reversed. I also agree that there is an inadequate basis to question the trial court's findings that American Motorists Insurance Company (AMICO) has a duty to indemnify its insureds.[1]

I write separately for two reasons. First, while the trial court correctly followed the direction provided by this Court in previous cases in evaluating whether the incidents at issue in this case constituted covered "occurrences" under the language of the comprehensive general liability (CGL) policy, the necessity for engaging in a two-step inquiry into whether there was an "accident" and whether damages were "intended or expected" when evaluating incidents under the standard terms of the CGL policy before us is unnecessarily duplicative. In the context of such a policy, the only analysis necessary in this regard is whether the damages were intended or expected from the standpoint of the insured. That inquiry sufficiently encompasses the threshold determination of "accident" as this Court has defined that term, and properly places the burden of proof on the question of coverage on the insured party. In addition,

---

[1] I also agree with the remand order, although I would additionally direct the Court of Appeals to consider the applicability of the pollution exclusion present in three of the policies issued by AMICO. The trial court found the exclusions inapplicable, defining the phrase "sudden and accidental" as used in the pollution exclusion clauses to mean "unintended and unexpected." But see *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 207; 476 NW2d 392 (1991), defining "sudden" to include "a temporal element that joins together conceptually the immediate and the unexpected" (citation omitted). The Court of Appeals did not address this issue, finding that there was no coverage in the first place.

while intent is an element of the coverage analysis, primary emphasis in determination of coverage for environmental pollution damage is most often placed on the insured's expectation of damage. Second, I wish to make clear that my agreement with the majority that we should not disturb the trial court's finding that there was no intent to cause property damage or any expectation of such damage from 1972 to 1974, contrary to the conclusion of the dissent, is not based on a refusal to impute the collective knowledge of Arco's employees to the corporation, as I interpret the majority to do. Instead, I find the evidence on the record insufficient to question the trial court's holding on this issue.

I

A

The applicable "Coverage" section of the policies issued by AMICO states that the insurer will pay damages its insureds become legally obligated to pay for covered bodily injury or property damage "caused by an occurrence." The "Definitions" sections of the policies define "occurrence" as follows:

> "[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured . . . .

The majority concludes from our prior decisions that, in order to determine if there has been an occurrence, a court must evaluate whether there has been an accident, and then, if an accident has occurred, whether any resulting damage was ex-

pected or intended from the standpoint of the insured. *Ante* at 404-405.

I acknowledge that in other recent cases in which insurance coverage has been afforded for occurrences, we have engaged in the two-step analysis embarked upon by the majority. *Auto Club Group Ins Co v Marzonie,* 447 Mich 624; 527 NW2d 760 (1994); *Group Ins Co of Michigan v Czopek,* 440 Mich 590; 489 NW2d 444 (1992); *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656; 443 NW2d 734 (1989). I therefore do not fault the trial court for following this direction. Federal courts applying Michigan law have similarly found the two-pronged analysis necessary in pollution coverage cases. *Fireman's Fund Ins Cos v Ex-Cell-O Corp,* 750 F Supp 1340 (ED Mich, 1990), but see *Ray Industries Inc v Liberty Mutual Ins Co,* 728 F Supp 1310 (ED Mich, 1989) (analyzing the issue of occurrence by focusing only on the insured's intent or expectation of damage), aff'd in part and rev'd in part on other grounds 974 F2d 754 (CA 6, 1992).[2]

In all our earlier cases noted above, coverage was provided for an occurrence defined only as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage . . . ."[3] It was then stated in the *exclusionary* section of the homeowners' policies[4] that the insurers did not cover "bodily injury or property damage which is

[2] In *Ray Industries,* the parties had stipulated that the insured did not actually intend or expect property damage. 728 F Supp 1315.

[3] The question whether damage occurred during the policy period was not at issue in these cases, nor has it been argued to this Court in the case at bar.

[4] I do not mean to suggest that the separate occurrence definition and intended or expected injury exclusion will always be present in homeowner's policies, only that this division was present in the homeowner's policies analyzed in prior cases.

either expected or intended from the standpoint of the insured."[5] *DiCicco, supra* at 672.

By articulating a definition for occurrence—which provides coverage—separate from a determination of expected or intended injury for exclusion of coverage, the policies in the cases noted dictated a two-pronged inquiry. We first had to determine whether coverage existed, applying the occurrence definition, before considering whether coverage was excluded because damage was intended or expected. "[T]he proper construction of a contract requires that we first determine whether coverage exists, and then whether an exclusion precludes coverage." *DiCicco, supra* at 668 (RILEY, J.).

In the present case, the definition of occurrence has been expanded to include what was exclusionary in the homeowner's policies. The question under the contract agreed to by the parties therefore is whether the damage for which Arco has become liable is covered by the policy, because it was caused by an "occurrence," i.e., an accident, including injurious exposure to conditions, that resulted, during the policy period, in property damage neither expected nor intended from Arco's standpoint.

This single inquiry into coverage under a CGL policy like the one before us allows a court to collapse the two-part investigation into the existence of an accident and whether damage was expected or intended, into a single question: whether the insured subjectively expected or in-

---

[5] While neither *Auto-Owners Ins Co v Churchman,* 440 Mich 560; 489 NW2d 431 (1991), nor *Allstate Ins v Freeman,* the companion case to *DiCicco,* provided coverage for occurrences, instead simply stating that coverage was provided for bodily injury, personal injury, or property damage, both policies provided within their exclusion sections that expected or intended property damage or personal injury was not covered, under either an objective or subjective standard. See also *Buczkowski v Allstate Ins,* 447 Mich 669; 526 NW2d 589 (1994) (interpreting an objective standard exclusion).

tended damage.[6] The two-pronged accident and intentional or expected damage test, under the current definition of accident employed by this Court, requires analysis of (1) whether there were unintended acts (wherein the results would clearly be unintended) or intentional acts with unintended or unexpected results, i.e., an accident,[7] then (2) whether the damage resulting from the accident was subjectively intended or expected. The same question is therefore being asked twice. Where the sole issue is one of coverage, I do not find this circular analysis necessary. Where the standard definition of an occurrence in a CGL policy is used, as in the present case, I would only require the insured to demonstrate that damage transpired during the policy period[8] and that it was neither expected nor intended by the insured in order to

[6] In *Frankenmuth Mutual Ins Co v Piccard,* 440 Mich 539; 489 NW2d 422 (1992), the two-pronged analysis used by the majority here was applied to the same CGL occurrence definition as in the present case; however, no majority of this Court agreed with the substantive analysis in *Piccard.* It therefore is not binding precedent. "Plurality decisions in which no majority of the justices participating agree as to the reasoning are not an authoritative interpretation binding on this Court under the doctrine of *stare decisis." Negri v Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976).

[7] As the majority correctly notes, an accident has been defined by this Court to mean " ' "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." ' " *Ante* at 404-405. This definition incorporates both unintended and unexpected results. See 10 Couch, Insurance, 2d (rev vol), § 41:7, p 9.

[8] The question when the damage occurred is one of whether coverage was "triggered." This normally contentious matter in pollution cases has not yet been addressed by this Court, and is not before us in the present case. See, e.g., *Ray Industries Inc v Liberty Mutual Ins Co,* 974 F2d 754 (CA 6, 1992) (describing the four theories of trigger, and concluding that this Court would adopt a continuous trigger theory on the facts of that case, which concerned insurance coverage for environmental pollution); *Ex-Cell-O Corp, supra* (adopting the exposure theory in an environmental pollution case). Application of the "injurious exposure to conditions" clause in the occurrence definition has also not been argued in this case.

prove that coverage exists.[9] "The newer definition of occurrence and accident [articulated in the post-1966 CGL policies][10] eliminates the need for an exact finding of the cause of damages so long as they are neither expected nor intended from the standpoint of the insured." 7A Appleman, Insurance Law & Practice (rev ed), § 4493, p 49.

Justice LEVIN noted the circularity of the two-pronged accident and expected or intended injury analysis earlier this term in *Marzonie, supra* at 652-662 (LEVIN, J., dissenting).[11] I will not repeat Justice LEVIN's analysis of this point, but note that I disagree with his conclusion that the presence of the expected or intended language in the exclusionary section of homeowner's policies like that in *Marzonie,* as opposed to its presence in the definition of a covered occurrence in the CGL policy in the present case, is of no significance. *Id.* at 659, n 24. It is the general rule of insurance contract interpretation, applied by this Court, that an insured bears the burden of proving coverage, while the insurer must prove that an exclusion to cover-

[9] Once coverage is shown, the determination whether coverage is precluded by an exclusion in the policy would be required.

[10] See *Marzonie, supra* at 652-662 (LEVIN, J., dissenting).

[11] A commentator analyzing the definition of "occurrence" soon after it was added to CGL policies made the following observation, applying an objective standard of expectation:

Let us assume for the purpose of argument that the expression "which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured" modifies the word "accident." We could then make an interesting observation. An "accident" is a negligent act which is not intentional and which causes unprecedented or unforeseeable injury or damage. It is obvious that "accident" is not something wilfully or deliberately caused. If the words "neither expected nor intended" refers to some conditions or damage accidentally caused but not caused by accident, then the words are nonsense. [Even, *The corporate insurance administrator—Problems with the 1966 revised liability policy,* 3 Forum 95, 104-105 (1967).]

age is applicable. *Williams v Detroit Fire & Marine Ins Co,* 280 Mich 215, 218; 273 NW 452 (1937); *Roddis Lumber & Veneer Co v American Alliance Ins Co,* 330 Mich 81, 88; 47 NW2d 23 (1951); *Ex-Cell-O, supra* at 1348, 1350. Under the CGL policy language before us, the burden is on the insured to prove that damage was neither expected nor intended. This issue is all encompassed within the issue of coverage, with any successive questions of exclusion being the burden of the insured to prove. Under a homeowner's policy requiring the two-pronged analysis, it would be the insured's burden to prove that an accident occurred, and the insurer's burden to prove that damage was expected or intended. While the question may be the same to both parties in analyzing application of the homeowner's policy to a particular set of facts,[12] the insured and insurer would have successive burdens, dictated by the policy, to prove the intent or expectation of damage.[13]

---

[12] But see *Shell Oil Co v Winterthur Swiss Ins,* 12 Cal App 4th 715, 748-752; 15 Cal Rptr 2d 815 (1993) (holding, inter alia, that "accident" in a CGL policy is the direct and immediate causal event of resulting property damage, and constitutes a separate inquiry from whether damages were intended or expected). I do not address the merits of the California court's construction of the accident definition, because this Court has clearly held that an "accident," analyzed in terms of whether there has been an occurrence, includes intentional acts resulting in unintended harm. *DiCicco, supra* at 670. "If the resulting damages can be viewed as unintended by a fact finder the result constitutes an 'accident' for purposes of the liability insurance policy; it is the quality of result rather than the quality of the cause that is controlling." 7A Appleman, *supra,* § 4492.02, p 31 (citations omitted).

[13] In the present case, the issue of the standpoint from which the happening of an occurrence should be viewed has been clearly stated in the policy as being that of the insured. *Czopek, supra* at 608-609 (Boyle, J., concurring).

I agree with the majority in the present case that a majority of this Court has recently found that, where an insurance policy is silent with regard to the standpoint from which an accident should be evaluated, such as in the homeowner's policies in *DiCicco, Czopek,* and *Marzonie,* the standpoint of the insured should be applied. *Ante* at 405. If an accident in such instances was viewed from the standpoint of the injured party, however, see *Czopek, supra* at 608-612

(BOYLE, J., concurring), the two-pronged inquiry dictated by the homeowner's policies would examine two distinct questions: 1) was there an accident from the injured party's perspective, and 2) was damage intended or expected from the standpoint of the insured.

> Not all courts have followed this rule [that an accident should be evaluated from the standpoint of the insured]. It has been traditional to deny insurance protection for deliberate, outrageous or irresponsible behavior as a form of punishment to the wrongdoer. One judge suggested that such a theory follows "the sporting theory of justice." It ignores the fact that most of the actors involved in irresponsible behavior are also financially irresponsible and that it is the injured victim that is really being punished. If punishment is the objective of these rulings surely some other way of doing so can be found. To look at only the insured's behavior ignores the fact that insurance also is for the benefit of injured victims of accidents. They are the third party beneficiaries of the insurance contracts and their situation should not be ignored. The interpretation of an insured's conduct is not only a dispute between the insured and his insurance company. Some courts have recognized this and consider the resulting injury from the point of view of the victim. If it was accidental from that point of view, the loss will be covered by the liability insurance issued to the actor. From the standpoint of the aggressor an injury willfully inflicted upon another is not an accident but from that of the victim of an uninvited and unprovoked aggression, the injury is accidental. [7A Appleman, *supra*, § 4492.02, pp 27-28.]

This perspective should not require the insurer to indemnify an insured for liability it did not contract to cover. For example, where damage is the result of inherently dangerous behavior engaged in with criminal intent, exclusion of coverage due to expectation, if not intentional infliction of injury may be apparent, even if the policy does not include an express criminal acts exclusion. See, e.g., *Continental Western Ins Co v Toal*, 244 NW2d 121 (Minn, 1976). In *Toal*, the Minnesota Supreme Court found error in a jury instruction that an occurrence definition identical to that in the present case barred recovery for injuries that were the natural and probable consequences of the insured's intentional act, or that merely foreseeable injuries were excluded. Nonetheless, the court held that intent to inflict injury, precluding insurance coverage, could be inferred as a matter of law, where the insureds participated in the armed robbery of a bowling alley that resulted in the death of an employee. *Id.* at 125-126. "[T]he insured need not intend the actual bodily injury inflicted in order to fall within the instant exclusionary clause. It is sufficient that the factfinder conclude the insured subjectively expected some type of harm reasonably foreseeable from the insured's standpoint." *DiCicco* at 731, n 11 (ARCHER, J., concurring in part and dissenting in part). Assertions by an insured in such a case that damage was not intended or expected appears to be a denial of expected harm that "flies in the face of all reason, common sense and experience . . . ."

B

As noted above, I do not fault the trial court in the present case for engaging in the two-pronged analysis of accident and intended or expected damage that this Court has previously stated is necessary. We provided that direction, however, without making a distinction between policies that separate the accident question and the intended or expected damage question between issues of coverage and exclusion, and policies with a standard occurrence definition encompassing both issues. The trial court's analysis of the case under this two-pronged test resulted in findings that satisfy the single intended or expected damage inquiry. While the trial judge did not expressly reference the burden of proof, he made an affirmative holding that property damage was not expected or intended by the insureds, rather than finding that there was insufficient proof of intent or expectation. I interpret the trial court's statement that it found no intent to contaminate the environment to mean that it found that Arco did not know that the leaching process it employed would contribute vocs to the ground water.[14] I thus agree with the majority that the Court of Appeals incorrectly reversed the trial court's decision.

II

In determining whether damage was caused by

*Id.* at 720 (BOYLE, J., concurring in part and dissenting in part) (citation omitted). But see *Marzonie, supra* at 666, n 36 (LEVIN, J., dissenting) (citing cases in which insurance coverage for injuries inflicted by insureds committing criminal acts was a question of fact).

[14] If the trial court had found only that Arco did not intend or expect the precise contamination that actually resulted from its process, but did expect some property damage, then the policies would not have provided coverage for Arco's liability. A literal "intent to contaminate the environment" was not necessary to find a subjective intent or expectation of property damage under the contract.

an occurrence where the insured is a commercial entity, the focus is primarily on whether the insured *expected* damage. Rynearson, *Exclusion of expected or intended personal injury or property damage under the occurrence definition of the standard comprehensive general liability policy,* 19 Forum 513, 514 (1984). In the context of environmental pollution, it will be the rare case in which the proofs will include testimony that an insured actually intended to cause property damage.

A determination whether an insured subjectively expected damage to occur from its actions clearly takes the inquiry out of the realm of mere reasonable foreseeability. In determining subjective expectation, we need not rely solely on the representations of the insured with regard to his subjective state of mind. Expectation can be inferred from the nature of the act in question and the high degree of probability, i.e., a substantial probability, of resultant damage.[15] It is in such

---

[15] Even those courts that advocate an objective inquiry into intent and expectation reject the suggestion that a mere reasonable foreseeability of damage is sufficient to bar coverage. *City of Carter Lake v Aetna Casualty & Surety Co,* 604 F2d 1052, 1058-1059 (CA 8, 1979). In *City of Carter Lake,* the court held that coverage should be excluded because of the objective expectation of damage only where "the actor knew or should have known that there was a substantial probability" of damage, defining substantial probability as indications of damage strong enough to warn the reasonably prudent actor that damage was "highly likely" to occur. The amici curiae in the present case who advocate that this Court adopt the objective standard of inquiry acknowledge that the policy dictates that the reasonable person be one who stands in the shoes of the insured, i.e., views the likelihood of damage "from the standpoint of the insured." Such observations lead me often to conclude that the objective versus subjective expectation debate, where subjective expectation can be proven by circumstantial evidence, generates more heat than light. Neither standard relies solely on the admissions of the insured in order to find an expectation of damage. In *City of Carter Lake,* the court held that when sewage backed up once and no action was taken by the insured to head off future incidents, there was a substantial likelihood of the occurrence of the second through sixth backup so as to preclude coverage for the subsequent incidents, because of an objective expectation of damage. It seems to me the court could have just as easily found that the

cases that an insured's claim that no injury was expected or intended "flies in the face of all reason, common sense and experience . . . ." *DiCicco, supra* at 720.[16]

In the present case, the trial court found that there was no subjective expectation of damage for two reasons. First, the court believed the insureds' testimony that they had no such expectation, and, second, the court found that there was insufficient knowledge possessed during 1968 through 1974 by either the insureds or the general community of experts in environmental pollution of the likelihood of property damage caused by release of VOCs to be able to infer that such expectation was subjectively possessed by the insureds. Therefore, even taking into account the collective knowledge of all of Arco's employees, *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 213; 476 NW2d 392 (1991), there was insufficient knowledge of the dangers of VOC contamination to provide sufficient evidence of expectation of property damage. I do not find the admission by Arco's chemist that he knew in 1972 that release of VOCs into the company's seepage lagoon *could* result in property damage sufficient evidence of an expectation that property damage *would* occur to question the conclusion of the trial court.

evidence was sufficient (one backup, and nothing done to correct the problem) to find a subjective expectation of damage, despite representations by the insured to the contrary. See also *Bituminous Casualty Corp v Tonka Corp,* 9 F3d 51 (CA 8, 1993) (the insured was found to have objectively expected property damage where the insured routinely dumped contaminant containing sludge on site, the insured admitted knowledge of contaminants in the sludge, and the insured and its employees had knowledge of the harmful character of the contaminants).

[16] The question of "intended or expected" damage from the standpoint of the insured thus essentially mirrors the definition of "intent" in tort law. 1 Restatement Torts, 2d, § 8A, p 15 (defining "intent" to mean "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it").

III

In summary, I agree that the judgment of the
Court of Appeals should be reversed, the findings
of the trial court reinstated, and the case re-
manded to the Court of Appeals for further consid-
eration. Where a CGL policy, including within its
definition of a covered occurrence the requirement
that there be an accident and that damage be
neither intended nor expected from the standpoint
of the insured, the only issue in determining if
coverage exists, other than whether damage oc-
curred during the policy period, is whether the
insured has fulfilled the burden of proving that it
neither subjectively expected nor intended the
damage. When the insureds are commercial par-
ties, this analysis will normally focus on the in-
sureds' expectation of damage. In the present case,
I find insufficient evidence to question the trial
court's finding that the insureds neither expected
nor intended property damage during the entire
period covered by the policies issued by AMICO.

RILEY, J. (*dissenting*). The dispositive issue in
this case is whether Arco intended or expected to
contaminate the environment through its actions
during 1968 through 1974, the period in which
defendant, American Motorists Insurance Co
(AMICO), insured it. The majority found that Arco
did not intend or expect that its actions within
this time frame would contaminate the environ-
ment. As a result, the majority concluded that an
occurrence within the definition of Arco's insur-
ance policy occurred and that AMICO should be
liable for coverage.

I agree that Arco did not expect or intend to
injure the environment during 1968 through 1972,
but I have come to a different conclusion regarding

the years spanning 1972 through 1974. In 1972, Arco hired Ed Koperdak, a chemist, who was aware that the volatile organic compounds (VOCS) used at the plant posed a serious danger to the environment. This knowledge was then imputed to the corporation under *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 213; 476 NW2d 392 (1991). Although Koperdak may not have been aware that these VOCS were being dumped into the drains that led to the seepage lagoon, other employees were aware, and their knowledge likewise was imputed to the corporation. Consequently, from 1972 through 1974, Arco was aware that it was dumping harmful VOCS into the lagoon. As a result, an occurrence within the definition of Arco's insurance policy did not occur, and AMICO should not be held liable for the damage caused to the environment during those years.

I

The insurance policy that this case revolves around was issued by AMICO to Arco in 1968. The policy was a comprehensive general liability policy which provided:

> [AMICO] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . caused by an *occurrence,* and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been

exhausted by payment of judgments or settlements. [Emphasis added.]

Under the language of this policy, AMICO's liability is triggered whenever an "occurrence" transpires. Fortunately, "occurrence" is defined within the policy as:

> [An] accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage *neither expected nor intended from the standpoint of the insured.* [Emphasis added.]

Unfortunately, the pivotal term "accident" is not defined within the policy. This is not an uncommon problem because in many insurance policies "accident" is not defined. When this happens, generally the "commonly used meaning" simply controls. *Group Ins Co of Michigan v Czopek,* 440 Mich 590, 596; 489 NW2d 444 (1992). In fact, this Court in *Auto Club Group Ins Co v Marzonie,* 447 Mich 624, 631-632; 527 NW2d 760 (1994), recently analyzed the common meaning of "accident" and found: " 'an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.' "

Hence, the first question becomes whether or not the vocs found their way to the seepage lagoon by means of an accident. The answer to this question is no. Ruth Kelly, an employee at Arco, testified that from about 1971 until 1973 she worked in the tool crib area cleaning glue guns. She would clean these guns by disassembling them and placing them into buckets of MEK, a powerful solvent. When these buckets became too dirty, she would

simply dump their contents into the drains as her foreman had instructed her to do.

*A.* We used MEK for cleaning the glue guns.

*Q.* For cleaning the glue guns?

*A.* Yes.

*Q.* Was there a machine that cleaned the glue guns?

*A.* No. I did it myself. You tear 'em down and remove the O-rings and stuff that can't go in the MEK. And then you put the metal parts into the gallon pails of MEK to soak the glue off of 'em.

*              *              *

*Q.* And you—would put the glue gun into the pail. Is that correct?

*A.* Right.

*              *              *

*Q.* Would you have to replace the MEK in the pails, periodically?

*A.* Yes.

*Q.* And why was that?

*A.* Because it got dirty.

*Q.* With . . .

*A.* With the glue in it.

*              *              *

*Q.* How would you dispose of that dirty MEK?

*A.* The foreman in there told me to dump it in the drain.

*Q.* Which drain?

*A.* This one right here.

*              *              *

*Q.* Do you recall how often these gallon pails would get dirty and have to be replaced? The solvent, I mean.

*A.* I would say maybe every other week. It would depend on how many times you had to clean the gun.

The fact that Kelly was intentionally dumping

these solvents every other week into the drains that led to the lagoon is by no means an "undesigned contingency" or "happening by chance." It was a conscious, intentional choice on her part and on her foreman's part because he told her to dump the buckets in this manner.

However, this was not the only time that Kelly intentionally brought about the flowing of VOCS to the lagoon. In 1973, Kelly began work on the epoxy machine where she had more experiences with VOCS. While working on the epoxy machine, one of her jobs was to use perchlor to clean up the epoxy that dripped from the machine every day. She deliberately poured this solvent onto the floor in order to loosen the epoxy from the floor. She would then mop up this epoxy-perchlor mixture right over the drains.

> *Q.* In this process would some of the epoxy or vinyl drip or spill onto the floor?
> *A.* Yes.
> *Q.* How often?
> *A.* Every day.
> *Q.* And how close was the epoxy machine to the drain?
> *A.* It sat right behind the drain. . . .
> *Q.* And as a [sic] epoxy machine operator was it your responsibility to clean the floors around the machine?
> *A.* Yes. It was.
> *Q.* How often would you have to clean those floors?
> *A.* Sometimes two or three times a day.
> *Q.* And do you recall whether you used a solvent to do that?
> *A.* Yes. At the time I think it was Perchlor we were using?
> *Q.* Perchlor?
> *A.* Yes.

*Q.* Where would you get that Perchlor?

*A.* From Compounding.

*Q.* When you would mop the floors with the Perchlor would that Perchlor go down the drains?

*A.* Oh, yeah. Because it sat right there where you were mopping over the drain again.

Kelly's act of mopping up the floors over the drains with perchlor was not uncommon—many of the other employees also cleaned the floors in this manner. In fact, the Court of Appeals in its decision wrote:

> Former Arco employees also testified that VOCs were used to mop the plant floors from at least 1964 to 1979. The mopping was often performed on and around the drains that led directly to the unlined lagoons. Given the frequency and volume of mopping required to clean the plant floors, some of the VOCs would invariably go into the drains and be washed into the lagoons. [198 Mich App 347, 352; 497 NW2d 190 (1993).]

Koperdak also testified about the use of volatile organic compounds to mop the floors of the plant.

*Q.* They would come into compounding and sometime use a requisition to indicate we want the mop water; is that correct?

*A.* Yes.

*Q.* And they would be given a volatile organic compound as that mop water, correct?

*A.* Yes.

*Q.* And this is from when you started at Arco in 1972 at least up until 1979; is that correct?

*A.* Yes.

These employees, through their actions, were intentionally bringing about the placement of the VOCs into the seepage lagoon. Their acts were not

simply "happenings by chance" or "undesigned contingencies." As a result, their acts were not accidents.

## II

The next question becomes, Could Arco have expected the harm that occurred? The answer to this question lies in whether or not Arco expected that the vocs were harmful and whether they expected that they were going into the seepage lagoon.

### A

Arco, without question, knew that these vocs were harmful because in 1972 it hired Ed Koperdak as a chemist. Koperdak admitted at trial that when he was hired he knew that the vocs being used at the plant posed a distinct danger to the environment.

> *Q.* You understood, did you not, when you came to Arco that it was important that volatile organic compounds not be discharged in the seepage lagoon, correct?
> *A.* Yes.
> *Q.* And you knew that . . . if those volatile organic compounds were discharged into the seepage lagoon they could degrade the environment; isn't that correct?
> *A.* Yes.

The fact that Koperdak possessed this knowledge is critical to the outcome of the case because under *Upjohn* this knowledge can be imputed to the corporation.

> "[K]nowledge acquired by employees within the

scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import." [*Upjohn, supra* at 213, quoting *United States v TIME-DC, Inc,* 381 F Supp 730, 738 (WD Va, 1974).]

Since Koperdak was employed as a chemist, any knowledge he acquired in regard to these VOCs would be within the scope of his employment and imputed to Arco. Hence, Arco knew that the VOCs were harmful to the environment.

### B

Arco also knew that the VOCs were going into the seepage lagoon. Koperdak prepared a memorandum on July 27, 1977, indicating that such VOCs should not be dumped into the pond.

> *Q.* To you, the purpose of this memorandum was to insure, was it not, that particular compounds didn't make their way into the Arco pond; is that correct?
> *A.* Yes.
> *Q.* It wasn't because you were worried about— this wasn't primarily designed out of a concern for accidents within the plant that might harm employees; is that correct?
> *A.* Yes.
> *Q.* So your concern about ammonia was also—or your primary, key concern with ammonia was it getting into the drains and getting into the pond?
> *A.* One of the concerns, yes.
> *Q.* And your concern with solvents was solvents getting into the drains and getting to the pond?
> *A.* Yes.

However, Koperdak claims that he prepared this

as just a general warning and not in response to any problem he was aware of.

> *Q.* In other words, when you came out with this memorandum you had never heard from anyone or had any knowledge or employees dumping any of these compounds in the drains?
> *A.* No.
>
> *     *     *
>
> *Q.* Did you also send around memos telling employees not to break windows or tip over machines, even though that had never occurred in the past?
> *A.* No.

In my opinion, Koperdak was aware that these vocs were leaking into the pond and it was this knowledge that inspired him to prepare the memorandum. In any event, even if he had no knowledge of these spills the result should remain the same since other employees were aware that these vocs were being placed into the seepage lagoon.

As stated before, Arco's employees were placing vocs into the drains that led out to the lagoon by either mopping over the drains with perchlor or dumping MEK directly into the drains. This knowledge was then imputed to Arco under *Upjohn.*

The majority, however, seems to argue that a specific employee has to know both that vocs are harmful and that they are being discharged into the lagoon in order for Arco to be able to expect that such harm will occur.

> Although it is tempting to infer intention or an awareness of the dangers of vocs, there simply was no testimony that any of Arco's employees released vocs into the environment with the intention to harm the environment. Furthermore, there was no testimony that anyone should have expected that harm would result from their actions. [*Ante,* p 415.]

This belief by the majority that an employee has to know of the harm and of the discharges in order for Arco to expect the damage, however, is simply not true. Arco is a corporation, and under *Upjohn,* a corporation, in essence, is an entity that possesses the combined knowledge of all its employees.

> Furthermore, we reject Upjohn's assertion that the information obtained by several of its employees was not acquired by any individual employee who then would have comprehended its full import. . . . Rather, the Upjohn Company is considered to have acquired the same collective knowledge of its employees . . . . [*Upjohn, supra* at 215-216.]

Since Arco knew, through Koperdak, that these vocs were harmful to the environment and since Arco knew, through Ruth Kelly and the other employees, that the vocs were going to the seepage lagoon, it knew and expected that such harm would occur.

This expectation of harm is very similar to the expectation possessed by the defendant in *Marzonie.* In that case, Oaks fired a shotgun at an automobile. Unfortunately, the driver of the vehicle was struck by the blast and severely injured. Oaks indicated that he did not intend to hurt anyone and as a result should be covered under his homeowner's insurance policy because the event occurred on his premises. This Court, however, found otherwise concluding that Oaks could have expected that his act of firing a shotgun at an occupied vehicle would injure someone. "[W]e find that Oaks should have expected bodily injury to result from firing this shotgun at Marzonie's occupied vehicle." *Marzonie, supra* at 644. As a result, an occurrence within the definition of Oaks'

insurance policy did not happen. Much like Oaks, Arco intentionally set loose something very dangerous—vocs. These vocs, like the pellets from Marzonie's shotgun, were headed toward a place where they would cause great harm, the environment.

The majority argues, however, that the facts here are similar to *Frankenmuth Mutual Ins Co v Piccard,* 440 Mich 539; 489 NW2d 422 (1992). In that case, Piccard intentionally set fire to his own store. While firemen were fighting the blaze, a fire fighter fell and was severely injured. This fireman then brought suit against Piccard, and Piccard's insurance company brought the action to determine its liability to defend Piccard, its insured. The majority writes that this Court held in *Piccard:*

> that the intentional act of setting the fire could still be defined as an "occurrence" as long as the act was not committed with the intention or expectation that the injury to the fireman would occur. [*Ante,* p 416.]

The majority then attempts to draw a parallel from *Piccard* to the present case.

> Similarly, in the instant case, even though the act of introducing vocs into the environment may have been intentional, there was no evidentiary support establishing that the acts were intended or expected to harm the environment. [*Id.*]

The majority, however, is incorrect. Arco knew that these vocs were harmful and were headed toward the unlined seepage lagoon. If Piccard knew that by setting the fire a fireman would fall from a roof and be injured, then surely he would have expected the injury and no accident would

have occurred. However, that was not the case and that is why *Piccard* is distinguishable.

### III

### CONCLUSION

It is my opinion that Arco did not intend or expect to harm the environment from 1968 until 1972, so AMICO should be held liable for the damages that occurred during those years. However, from 1972 through 1974, Arco knew that VOCS were being deliberately placed into the drainage ditches that led out to the lagoon. It also knew that these VOCS posed a danger to the environment. Hence, it knew that its actions would cause serious environmental harm. As a result, the damage that happened to the environment from 1972 until 1974 was expected by Arco and was not an accident. Thus, an occurrence within the definition of Arco's insurance policy never happened and AMICO's liability was never triggered during those years.

WEAVER, J., took no part in the decision of this case.