**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 11, 2002**

ALLSTATE INSURANCE COMPANY,

    Plaintiff-Appellee,

v                                   No. 118266

ROBERT DANIEL MCCARN, a Minor;
ERNEST WARD MCCARN; PATRICIA
ANN MCCARN,

    Defendants,

and

NANCY S. LABELLE, Personal
Representative of the Estate of
KEVIN CHARLES LABELLE, Deceased,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

    This is an action for declaratory judgment.  Allstate

Insurance Company seeks a determination of its obligation to

indemnify its insureds in connection with an underlying wrongful death suit stemming from the shooting death of Kevin LaBelle.

We hold that the shooting death of Kevin LaBelle was "accidental" and, thus, an "occurrence" as defined in the insurance policy at issue. Consequently, an "occurrence" gives rise to Allstate's liability under the policy. Therefore, we reverse the decision of the Court of Appeals and remand to the Court of Appeals to decide whether the criminal acts exception in this policy excludes coverage.

I

This case arises out of the death of sixteen-year-old Kevin LaBelle on December 15, 1995, at the home of defendants Ernest and Patricia McCarn, where their grandson, then sixteen-year-old defendant Robert McCarn, also resided. On that day, Robert removed from under Ernest's bed a shotgun Robert's father had given him the year before. The gun was always stored under Ernest's bed and was not normally loaded. Both Robert and Kevin handled the gun, which Robert believed to be unloaded. When Robert was handling the gun, he pointed it at Kevin's face from approximately one foot away. Robert pulled back the hammer and pulled the trigger and the gun fired, killing Kevin.

Nancy LaBelle, representing Kevin's estate, brought the underlying action against Robert and his grandparents, Ernest and Patricia McCarn, who had a homeowners insurance policy with plaintiff Allstate. Allstate brought the present action, seeking a declaratory judgment that it had no duty to indemnify defendants Robert, Ernest, or Patricia McCarn.

Plaintiff and defendants moved for summary disposition in the declaratory action. The trial court granted defendants' motions for summary disposition and denied plaintiff's, holding that the events constituted an "occurrence" within the meaning of Allstate's policy. The trial court also held that Robert McCarn's conduct was not intentional or criminal within the meaning of Allstate's policy.

Allstate appealed to the Court of Appeals, which reversed the trial court in an unpublished opinion.[1] The Court attempted to apply our recent decisions in *Nabozny v Burkhardt*[2] and *Frankenmuth Mut Ins Co v Masters*[3] and concluded that "Robert's intentional actions created a direct risk of harm that precludes coverage."

Defendant LaBelle sought leave to appeal. We granted leave.

---

[1] Issued October 3, 2000 (Docket No. 213041).

[2] 461 Mich 471; 606 NW2d 639 (2000).

[3] 460 Mich 105; 595 NW2d 832 (1999).

3

In determining whether Allstate must indemnify the McCarns, we examine the language of the insurance policies and interpret their terms pursuant to well-established Michigan principles of construction. *Masters* at 111.

An insurance policy must be enforced in accordance with its terms. *Id.* If not defined in the policy, however, we will interpret the terms of the policy in accordance with their "commonly used meaning." *Id.* at 112, 114.

The McCarns' homeowners insurance policy provides in pertinent part:

> Subject to the terms, conditions and limitations of this policy, Allstate will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an occurrence to which this policy applies, and is covered by this part of the policy.

According to the plain meaning of the policy, liability coverage for damages arises from an "occurrence." The term "occurrence" is defined in the insurance policy as: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in bodily injury or property damage."

Our task, therefore, is to determine whether the case before us involved an "accident."

III

In the instant case, the policy defines an occurrence as an accident, but does not define what constitutes an accident. In similar cases where the respective policies defined an occurrence as an accident, without defining accident, we have examined the common meaning of the term. In such cases, we have repeatedly stated that "'an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected.'" *Masters* at 114, quoting *Arco Ind Corp v American Motorists Ins Co*, 448 Mich 395, 404-405; 531 NW2d 168 (1995)(opinion of Mallett, J.); *Auto Club Group Ins Co v Marzonie*, 447 Mich 624, 631; 527 NW2d 760 (1994); *Metropolitan Property & Liability Ins Co v DiCicco*, 432 Mich 656, 670; 443 NW2d 734 (1989).

Accidents are evaluated from the standpoint of the insured, not the injured party. *Masters* at 114, n 6. In *Masters,* we held that "the appropriate focus of the term 'accident' must be on both 'the injury-causing *act* or *event* and its relation to the resulting property damage or personal injury.'" *Id.* at 115, quoting *Marzonie* at 648 (Griffin, J., concurring) (emphasis in original).

We also stated that "'an insured need not act unintentionally' in order for the act to constitute an

5

'accident' and therefore an 'occurrence.'" *Id.*

Where an insured does act intentionally, "a problem arises 'in attempting to distinguish between intentional acts that can be classified as "accidents" and those that cannot.'" *Id.*

In *Masters* at 115-116, we applied the following standard from Justice Griffin's concurrence in *Marzonie* at 648-649.

> [A] determination must be made whether the consequences of the insured's intentional act "either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured's actions. When an insured acts intending to cause property damage or personal injury, liability coverage should be denied, irrespective of whether the resulting injury is different from the injury intended. Similarly, . . . when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for *any* resulting damage or injury, despite the lack of an actual intent to damage or injure." [Emphasis in original.]

What this essentially boils down to is that, if both the act and the consequences were intended by the insured, the act does not constitute an accident. On the other hand, if the act was intended by the insured, but the consequences were not, the act does constitute an accident, unless the intended act created a direct risk of harm from which the consequences should reasonably have been expected by the insured.

As to the perspective from which the analysis should be made, the question is not whether a *reasonable person* would

6

have expected the consequences, but whether the *insured* reasonably should have expected the consequences. Accordingly, an objective foreseeability test should not be used in the present context. Rather, the analysis must be that, to avoid coverage, the consequence of the intended act, which created a direct risk of harm, reasonably should have been expected by the insured.

The policy language dictates whether a subjective or objective standard is to be used.[4] However, the policy language here does not indicate whether a subjective or objective standard is to be used. Because "[t]he definition of accident should be framed from the standpoint of the insured . . . ," *Masters* at 114, and because, where there is doubt, the policy should be construed in favor of the insured, *id*. at 111, we conclude that a subjective standard should be used here. Further, in *Masters,* this Court, faced with similar policy language, concluded that there is no coverage where the insured intended his action, and the consequences of this intended action "either were intended *by the insured* or

---

[4] For example, a policy that excludes coverage of bodily injury that is expected "from the standpoint of the insured," dictates a subjective standard, *Metropolitan Property & Liability Ins Co v DiCicco*, companion case to *Allstate Ins Co v Freeman*, 432 Mich 656, 709; 443 NW2d 734 (1989), just as a policy that covers bodily injury not expected "by the insured," also dictates a subjective standard*, Fire Ins Exchange v Diehl*, 450 Mich 678, 685; 545 NW2d 602 (1996).

7

reasonably should have been expected because of the direct risk of harm intentionally created by the insured's actions." *Id.* at 115.

In our judgment, the language "by the insured" modifies both "intended" and "expected." Therefore, there is no coverage where the consequences of the insured's act were either "intended by the insured" or "reasonably should have been expected *by the insured.*" The language, "by the insured," indicates that a subjective standard should be used here. *Fire Ins Exchange v Diehl*, 450 Mich 678, 685; 545 NW2d 602 (1996). Although, "[n]egligence alone is not sufficient to prevent the death from being an accident within the meaning of the policy," *Collins v Nationwide Life Ins Co*, 409 Mich 271, 277; 294 NW2d 194 (1980), when the acts of the insured rise to the level of a "direct risk of harm intentionally created"—a level of culpability only slightly lower than intentionally acting to produce an intended harm-coverage is precluded, where the insured reasonably should have expected the harm, as the situation is virtually indistinguishable from intentionally causing the harm.

Further, the "direct risk of harm" must have been "intentionally created by the insured's actions." This language shows that the *Masters* test is not objective. On the contrary, the inquiry is entirely subjective-did the insured

8

*intentionally* create a direct risk of harm?  In this case, there was no intentional creation of a direct risk of harm because of the undisputed evidence that Robert McCarn believed he was pulling the trigger of an unloaded gun.

The dissent is incorrect in concluding that this Court adopted an *objective* test in *Masters*.  As previously stated, in our judgment, the language "by the insured" modifies both "intended" and "expected," indicating a subjective test.  A subjective test is not only consistent with *Masters* and *Nabozny*, it is the required test, based on the language the *Masters* Court adopted from *Marzonie*.  Accordingly, we are not abandoning the rule established in *Masters*, as the dissent contends; rather, we are simply adhering to this rule.  See *post* at 9, n 6.

Applying these principles to the present case, viewed from the standpoint of the insured, we hold that Kevin LaBelle's death was an "accident," thus an "occurrence," covered under the insurance policy.  We agree with plaintiff that Robert intended to point the gun at Kevin and pull the trigger.  However, Robert believed the gun was not loaded.  Robert had no intention of firing a loaded weapon.  No bodily injury would have been caused by Robert's intended act of pulling the trigger of an unloaded gun.

9

The dissent states:

> What is the direct risk of harm consonant with pulling the trigger of a firearm? The obvious risk is that the weapon, if loaded, might discharge and cause an injury. In my view, the evidence adduced at the summary disposition stage warrants the conclusion that the insured should have reasonably expected the consequences of his intentional act. [Slip op at 13.]

We agree that this case does not present a question of fact. The fact that Robert believed the gun was unloaded is a matter about which there is no genuine issue of material fact. This is because there is nothing in the record to reasonably support a conclusion that, contrary to Robert's testimony that he believed the gun was unloaded, he consciously believed the gun was loaded, or even contemplated that there was any possibility that it was loaded when he pulled the trigger. Even plaintiff, the insurer, acknowledged that Robert believed the firearm was unloaded when he pulled the trigger:

> *McCarn's subjective*, although erroneous, belief that the firearm was not loaded does not alter the fact that he picked up the gun, pointed it, pulled back the hammer and pulled the trigger.

Further, Robert made statements at his deposition to support his belief that the gun was not loaded: Robert and Kevin were "horsing around" with the gun as they had done on previous occasions; Robert was surprised when the gun actually fired; and, immediately following the discharge of the gun,

10

Robert called 911.  Thus, there is nothing to reasonably indicate that Robert entertained knowledge that the gun might have been loaded.

In short, it would be speculation to suggest that Robert intentionally shot his friend or was conscious of a nontheoretical possibility that a shell was in the gun when he pulled the trigger.  Clearly, such speculation cannot suffice to establish even a genuine issue of material fact, let alone to conclude that Robert's intended act of pulling the trigger of an unloaded gun intentionally created a direct risk of harm.

The dissent goes to great lengths to show that under an objective standard, the insured should have reasonably expected the consequences.  We simply cannot agree because the language of the test adopted in *Masters* requires us to *subjectively* analyze what Robert thought when he pulled the trigger.  Robert thought he was pulling the trigger of an *un*loaded gun.[5]

---

[5] The dissent asserts that this opinion makes "the insured's subjective belief regarding the status of the gun definitive." *Post* at 12.  While this is not inaccurate, this should not be confused with making the insured's own *assertions* of his subjective belief definitive.  A subjective test does not require courts to simply accept uncritically the insured's own assertions regarding his subjective belief.  Instead, courts must examine the totality of the circumstances, including the reasonableness or credibility of the insured's assertions, evidence of "other acts," evidence
(continued...)

11

Robert McCarn may have been negligent in failing to see if the gun was loaded before he pulled the trigger, particularly because he was the last person to use the gun weeks earlier for target practice. However, the issue of negligence is not before us. As we stated in *Collins,* the negligence of the insured in acting as he did is not enough to prevent an incident from being an accident if the consequence of the action (e.g., shot coming from a gun) should not have reasonably been expected by the insured.[6]

While it may be considered quite obvious that Robert's conduct was careless and foolish, it was negligence that

---

[5](...continued)
concerning the faculties or the maturity of the insured, evidence concerning relationships between an insured and a victim of an injury, and so forth. In this case, there is simply no evidence to suggest that the insured intended shot to be discharged from *this* gun when he pulled its trigger.

Further, that the insured can *now* logically explain how the accidental shooting most likely occurred, i.e., that the insured forgot to unload the gun the last time he used it, does not transform an otherwise accidental shooting into an intentional creation of a direct risk of harm. Merely because one can explain, after the fact, how an insured's actions inexorably led to certain consequences does not mean that that insured reasonably should have expected those consequences. If that were true, the only covered occurrences would be inexplicable ones.

[6] The dissent asserts that Robert's prior use of the gun should be considered in deciding whether Robert should have reasonably anticipated the harm caused. However, at most, the prior use of the gun would establish Robert was negligent. In Michigan, the test is not whether the insured was negligent, but whether the insured should have reasonably expected the consequence.

simply did not rise to the level that he should have *expected* to result in harm.  Otherwise, liability insurance coverage for negligence would seem to become illusory.  We must be careful not to take the expectation of harm test so far that we eviscerate the ability of parties to insure against their own negligence.[7]

The problem, as we see it, with the dissent's opinion is that it undermines the ability of insureds to protect themselves against their own foolish or negligent acts.  If courts are to review the acts of insureds for "objective reasonableness," as the dissent proposes, the very purpose of insurance would be compromised as insureds would find it increasingly difficult to recover on claims arising from injuries set in motion by foolhardy conduct on their own part or on the part of their families.  However, the impetus for insurance is not merely, or even principally, to insure oneself for well thought out and reasoned actions that go

---

[7] The dissent refers to Robert's nolo contendere plea to manslaughter.  Slip op at 3.  However, given that such a no-contest plea does not have the effect of an admission for any other proceeding than the one in which it is entered, MCR 2.111(E)(3), that plea has no legal relevance to this case.  Regardless, even if we assume Robert's guilt of manslaughter in connection with this case, that does not change the fact that the shooting was an accident.  Similarly, the dissent refers to Robert having smoked marijuana, slip op at 3, n 3, but this has no serious relevance to the issues at hand.  Smoking marijuana did not affect the establishment of intent by Robert.

wrong, but to insure oneself for foolish or negligent actions that go wrong. Indeed, it is obviously the latter that are more likely to go astray and to precipitate the desire for insurance. Under the dissent's approach, however, only the former actions would be clearly covered "accidents," or, at least, would clearly avoid disputes over coverage with insurers

Further, under the dissent's approach, only occurrences that were truly unexplainable would be covered "accidents." For, in retrospect, a sufficiently diligent insurer could almost always determine the physical cause of an accident, tracing it back to *some* prior conduct by the insured that should have been performed differently. Actions have consequences, and with sufficient effort, a connection between an occurrence and a prior action on the part of the insured can invariably be identified. However, merely because, in retrospect, an insurer is able to identify such a connection, does not mean that what took place was not an "accident." If one is driving too fast on a highway, not intending to but nonetheless causing an accident, it can hardly be denied that what has resulted is an accident despite the fact that it might be traceable to "objectively unreasonable" conduct by the insured, i.e. driving too fast on a highway.

Contrary to what our dissenting colleagues state, we are not abandoning or calling into question the rule from *Masters* in any way.  The facts of this case are distinguishable from *Masters* and *Nabozny*, where we held that specific acts failed to qualify as accidents under the respective insurance policies.  In *Nabozny*, the plaintiff broke his ankle during a fight when the insured tripped him.  The insured, while not intending to break the plaintiff's ankle, did intend to fight with him.  This and the effort to trip during the fight was the creation of a direct risk of physical harm that should have caused the insured to reasonably expect the consequences that ensued.  Thus, we concluded that the injury was not an accident.

In *Masters*, the insured and his son intentionally set a fire, intending to cause damage in their clothing store only, but that ultimately destroyed not just their store, but also a neighboring building.  We held that the applicable insurance policy, which precluded coverage for intentional acts, did not provide coverage under the circumstances.  Our reason was that, when the insured acted by starting a fire, it is irrelevant that the consequence, which was burning property, was different in magnitude from that intended.

The difference between this case and *Nabozny* and *Masters*, however, is that here, while the act was intended, the result was not.[8]  Thus, unlike in *Nabozny,* Robert should not have reasonably expected the consequences that ensued from his act because his intended act was merely to pull the trigger of an unloaded gun.  Similarly, unlike *Masters,* where the consequence of the act was intended, here the consequence—shot leaving the gun—was not intended.  Furthermore, even if one used some variation on a foreseeability test, no bodily harm could have been foreseen from Robert's intended act, because he intended to pull the trigger of an unloaded gun, and, thus, it was not foreseeable, indeed it was impossible, under the facts as Robert believed them to be, that shot would be discharged.  Therefore, we cannot say Robert should have expected the unfortunate consequences of his act.  The

---

[8]  The dissent contends that "[t]here is no such 'difference' among these three cases. Rather, in *both Masters* and *Nabozny*, the insureds made precisely the same claim as presented here-that they did not intend *the result* of their deliberate acts." *Post* at 8 (emphasis in original).  What the dissent is missing is that the insureds in *Masters* and *Nabozny did* intend the results of their deliberate acts-the fire and the tripping; they just did not intend the magnitude of those results-the burning down of the neighboring building and the broken ankle.  So, again, this case *is* different from *Masters* and *Nabozny* because there the insureds *did* intend the results of their deliberate acts, while here the insured did *not* intend the result-the firing of shot-of his deliberate act-the shooting of a gun that he believed to be unloaded.

discharge of the shot was an accident and entitled to coverage unless a policy exclusion applies.

V

Allstate maintains that Robert McCarn's actions constitute a criminal act that, under the policy's criminal acts exclusion, negates Allstate's duty to indemnify the insureds. The Court of Appeals did not reach this issue because it concluded that Robert's actions created a direct risk of harm that precluded coverage. We remand this case to the Court of Appeals to decide this issue.

VI

We hold today that Kevin LaBelle's death was an "accident," and thus an "occurrence," covered under the policy because Robert did not intend or reasonably expect that his actions, pointing and pulling a trigger of an *unloaded* gun, would cause any bodily injury to Kevin LaBelle. We reverse the judgment of the Court of Appeals and remand to the Court of Appeals to decide whether the criminal-acts exception in this policy excludes coverage.

KELLY, TAYLOR, and MARKMAN, JJ., concurred with CAVANAGH, J.

17

# STATE OF MICHIGAN

## SUPREME COURT

ALLSTATE INSURANCE COMPANY,

    Plaintiff-Appellee,

v                                                                    No. 118266

ROBERT DANIEL MCCARN, a Minor;
ERNEST WARD MCCARN; PATRICIA
ANN MCCARN,

    Defendants,

and

NANCY S. LABELLE, Personal
Representative of the Estate of
KEVIN CHARLES LABELLE, Deceased,

    Defendant-Appellant.

_____

YOUNG, J. (*concurring in part and dissenting in part*).

I agree with the majority that this case should be remanded to the Court of Appeals so that the applicability of the intentional act and criminal act policy exclusions can be decided. However, I respectfully dissent from that portion of the majority opinion that concludes that the policy provides indemnity coverage because the majority finds that the shooting incident here constituted an "accident" and thus an "occurrence" under the policy. The majority essentially

adulterates any consistent or coherent application of the standards set forth by this Court just two terms ago in *Masters*[1] and later applied in *Nabozny*[2] concerning the differentiation between an accident and an intentional act. The majority's effort to distinguish the facts of this case from *Masters* and *Nabozny* are hollow and simply debases the clear standard set forth in those opinions.

I believe that the application of the definition of the term "accident" we recently announced in *Masters* and *Nabozny*, in which we construed identical policy language, requires an objective view of the insured's actions.

Under the facts of this case, the insured should have reasonably expected the consequences created by pointing a gun at another and pulling the trigger without checking to verify that it was unloaded. Accordingly, I would affirm summary disposition in favor of plaintiff.

## I. ADDITIONAL FACTS

According to Robert McCarn's deposition testimony, he and Kevin LaBelle went to McCarn's house after school. At some point in the afternoon,[3] McCarn retrieved his .410 shotgun

---

[1] *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105; 595 NW2d 832 (1999).

[2] *Nabozny v Burkhardt*, 461 Mich 471; 606 NW2d 639 (2000).

[3] Before retrieving the shotgun, McCarn testified that
(continued...)

2

from under his grandfather's bed.  Both boys handled the weapon.

LaBelle and McCarn argued over crackers; LaBelle had the crackers and refused to share them with McCarn when asked to do so.  Attempting to frighten LaBelle into sharing the crackers,[4] McCarn intentionally pointed the shotgun at LaBelle with the barrel being approximately one foot away from LaBelle's face.  McCarn again asked LaBelle for the crackers, but LaBelle declined to share them.  McCarn pulled the hammer back, pretended to pull the trigger "a couple" times, and then actually pulled the trigger.  The weapon discharged and LaBelle was killed.  As a result of the death, McCarn pleaded nolo contendere to manslaughter, MCL 750.321.

In both his statement to the police and his deposition testimony, McCarn stated that he thought the gun was unloaded and would simply "click" when the trigger was pulled.  McCarn acknowledged, however, that he did not check the gun to verify

---

[3](...continued)
he and LaBelle got something to eat after school, went to a friend's house for ten minutes, smoked "[o]ne joint and a bowl" of marijuana, watched videos, and played with a guinea pig and a hedgehog.

[4] While earlier in his testimony, McCarn denied pointing the gun at LaBelle with the intention of frightening him, stating that he was "just playing," he also admitted that he thought the anticipated clicking sound "would be frightening" to LaBelle.  Later on in his testimony, McCarn admitted that he was "attempting to frighten" LaBelle "into giving [him] the crackers."

that it was unloaded before pulling the trigger. McCarn stated that he had owned the gun "for at least a year" before the shooting and had successfully completed a gun safety course. He also admitted that he had last used the gun without his grandparent's permission for target practice weeks before the shooting. On this prior occasion, McCarn was "in a hurry" to put the gun away because he did not want his grandparents to catch him using the weapon without their supervision. McCarn could not recall if he had unloaded the shotgun in his hurry to put the weapon away.

## II. *MASTERS* AND *NABOZNY*

The policy language in this case and in *Masters* and *Nabozny* are *identical*. Each policy provided coverage for an "occurrence," which was later defined as an "accident." Accident was not further defined.

### A. *MASTERS*

*Masters* involved an intentionally set fire that had the unintended result of destroying nearly a block of business establishments. As in this case, the policy in *Masters* provided coverage for an "occurrence," which was later defined in the policy as "an accident." 460 Mich 113. The insureds claimed that the event was an accident because, although the fire in their business premises was deliberately set, they did not intend to damage the adjoining buildings.

4

The Court of Appeals applied a subjective standard in assessing whether the insured arsonists expected or intended to burn properties other than their own. This Court reversed. We first gave "accident" its customary, ordinary meaning as an "undesigned contingency, a casualty, a happening by chance, something not anticipated, . . . and not naturally to be expected." *Id*. at 114. Having defined accident, we nevertheless recognized the difficulty of categorizing cases in which the action giving rise to the harm was intended even though the consequences were not. We *unanimously* held that an insured's intentional actions precluded coverage *even though* the insureds claimed not to have intended the consequences of their actions where the insured *"reasonably should have expected"* the harm the insured's acts created. We adopted this objective standard from Justice GRIFFIN'S concurrence in *Auto Club Group Ins Co v Marzonie*, 447 Mich 624, 648-649; 527 NW2d 760 (1994):

> In such cases, a determination must be made whether the consequences of the insured's intentional act either were intended by the insured or *reasonably should have been expected* because of the direct risk of harm intentionally created by the insured's actions. When an insured acts intending to cause property damage or personal injury, liability coverage should be denied, irrespective of whether the resulting injury is different from the injury intended. *Similarly, . . . when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for any resulting damage or injury, despite the lack of an actual intent to damage or*

5

*injure.* [*Masters*, 460 Mich at 115-116 (Emphasis added.)]

Granting summary disposition to the insurer, this Court held that, because the Masters intended to cause harm, "[i]t is irrelevant whether the harm that resulted, damage to the clothing store and surrounding businesses, was different from or exceeded the harm intended, minor damage to the clothing inventory." *Id*. at 116-117. We later applied this same objective test in *Nabozny*.

## B. NABOZNY

Similarly, in *Nabozny*, the plaintiff was injured in a fight with the insured. The policy at issue was identical to the one in *Masters* and this case, and provided coverage for an "occurrence," which, in turn, was defined as "an accident". 461 Mich 474. As in the present case, the insured claimed that the injury he caused was a covered occurrence because he did not intend to break the plaintiff's ankle. We unanimously rejected that argument, holding:

> In this case, Mr. Burkhardt apparently did not intend to break Mr. Nabozny's ankle. However, it is plain that in tripping someone to the ground in the course of a fight, *Mr. Burkhardt reasonably should have expected the consequences of his acts because of the direct risk of harm created*. This precludes a finding of liability coverage under the terms of this policy. In other words, the injury did not result from an "accident."

> Moreover, Mr. Burkhardt's testimony that he did not intend to "break any bones" does not assist him. In our quote from *Marzonie,* Justice GRIFFIN

6

cited *Piccard,* which explained:

> "[W]here a direct risk of harm is intentionally created, and property damage or personal injury results, there is no liability coverage even if the specific result was unintended. It is irrelevant that the character of the harm that actually results is different from the character of the harm intended by the insured."

> It is clear from the facts, as stated by the insured, that injury reasonably should have been expected. Therefore, it is irrelevant that the broken ankle was not the specific harm intended by the insured. [*Id.* at 480-481 (citations omitted).]

It is worth reemphasizing that in both *Masters* and *Nabozny* the policy language we construed was *identical* to the policy language contained in the present case. Here, like *Masters* and *Nabozny*, the insured engaged in a deliberate act but claimed that the resulting unintended consequences rendered the event an accident. In both *Masters* and *Nabozny*, this Court rejected this argument and held that there was no covered "occurrence" because the insured *reasonably should have expected* the consequences of his intentional actions—even when the insured himself did not anticipate such consequences. Thus, in *Masters* and *Nabozny* we declined to view the expectation of the injury from the subjective perspective of the insureds in making the determination whether an accident occurred.

C. THE MAJORITY'S MISAPPLICATION OF *MASTERS* AND *NABOZNY*

The majority erroneously states that the "difference"

7

between the present case and *Masters* and *Nabozny* "is that here, while the act was intended, the result was not." Slip op at 16. There is no such "difference" among these three cases. Rather, in *both Masters* and *Nabozny*, the insureds made precisely the same claim as presented here—that they did not intend *the result* of their deliberate acts. Robert intended to pull the trigger of his shotgun, but he testified that he did not intend to cause any physical injury to his friend. The question for the purpose of coverage is whether the shooting can be considered an accident because Robert should *not* have *reasonably expected* the consequences when he intentionally aimed his shotgun at the head of his friend, cocked the hammer, and pulled the trigger.

The purported difference between this case and *Masters* and *Nabozny* has been *created* by the majority, which has imposed a different construction of the phrase "intentional act." As stated in *Masters*, this Court unanimously adopted an *objective* test of intentionality: an intentional act causing injury is not an accident if the insured actually intended the harm or if the harm should *reasonably* have been expected.[5]

---

[5] To reiterate, the Masters standard is as follows: "[A] determination must be made whether the consequences of the insured's intentional act 'either were intended by the insured or *reasonably should have been expected* because of the direct risk of harm intentionally created by the insured's actions.'" The majority attempts to avoid applying an objective standard,
(continued...)

8

Here, the majority fails to apply the objective *Masters* test of intentionality, instead substituting a subjective one.[6] The majority states that "[w]e agree with plaintiff that Robert intended to point the gun at Kevin and pull the trigger.[7] *However, Robert believed that the gun was not loaded. Robert had no intention of firing a loaded weapon.* No bodily injury would have been caused by Robert's intended act of pulling the trigger of an unloaded gun." Slip op at 9 (emphasis added). What the majority must justify, but cannot,

---

[5](...continued)

urging that, in the *Masters* standard, "by the insured" modifies both "intended" and "expected." This is grammatically incorrect. In fact, grammatically speaking, the phrases "intended by the insured" and "reasonably should have expected" modify "consequences." Therefore, the *Masters* standard unqualifiedly and grammatically requires an inquiry into the reasonableness of the insured's expectations concerning the consequences of his intentional acts. This is an objective inquiry, not, as the majority contends, a subjective one.

It appears to me that this Court wisely chose to use an objective definition of accident in *Masters* because it creates a disincentive for collusion between an insured and a plaintiff. See *Nabozny, supra* at 479, n 10.

[6] This Court is free to abandon for sufficient reason its own precedent. When it does so, it should do it openly and provide justification. Here the majority abandons the rule it established in *Masters* after years of contradictory precedent without acknowledging (1) that it has done so or (2) why it is justified in doing so.

[7] I note that the majority would have no factual or legal basis for concluding otherwise, because defendant admitted that he intentionally aimed the gun, engaged the hammer and pulled the trigger in order to frighten his friend during their dispute over crackers.

9

is why we must consider his act of pointing a shotgun at another person and pulling the trigger from Robert's subjective perspective.[8] Under the *Masters* test, the question is whether the insured "reasonably" should have expected the consequence because of the direct risk of harm he intentionally created. However, the majority tautologically concludes as a matter of law that "*Robert* should not have reasonably expected the consequences that ensued from his act because his intended act was merely to pull the trigger of an *unloaded* gun."[9] Slip op at 16 (emphasis added). However,

---

[8] This insistence on viewing Robert's act from his subjective perspective represents a critical flaw in the majority opinion. The majority declares that it must employ a subjective standard because this, as opposed to an objective standard, aids in construing the policy in favor of coverage. "[W]here there is doubt, the policy should be construed in favor of the insured . . . ." Slip op at 7.

This is contrary to the rules of contract interpretation. Contracts, even insurance contracts, are construed according to their unambiguous terms. It is only when there is an ambiguity in the policy language that provides a basis for using a rule of construction favoring coverage. *Masters*, *supra* at 111. Because we considered the very contract term at issue here, "accident," in *Masters* and *Nabozny* and found no ambiguity, the majority has no warrant to "construe" that term in any different fashion in this case.

[9] Yet another flaw in the majority opinion is that it attempts to divide the "intentional act" into components. Rather than view the act from the required perspective—the consequences *reasonably* expected when a direct risk of harm is created—the majority focuses on whether the insured intended to pull the trigger of an *unloaded* gun. Without basis, the majority subdivides the intentional act into two components, the voluntary act and the chain of events that the volitional
(continued...)

10

what Robert's reasonable expectations *should have been*, not what his actual subjective beliefs may or may not have been, are the focus of the *Masters* standard.

The majority erroneously maintains that the test we articulated in *Masters* and *Nabozny* is a subjective one. However, the majority fails to explain our objective application of the test in both cases. In addition, the term "reasonably" has consistently been construed as indicating an objective rather than a subjective standard. In *Allstate Ins Co v Freeman*, 432 Mich 656; 443 NW2d 734 (1989), six justices, including the author of the current majority opinion, agreed that "'reasonably be expected' is unambiguous" and "requires application of an objective standard of expectation." 432 Mich 688. In *Fire Ins Exchange v Diehl*, 450 Mich 678, 685; 545 NW2d 602 (1996), the Court held that injury "'neither expected nor intended by the insured'" required a subjective standard of expectation where the policy language did "*not* employ the term '*reasonably*.'" (Emphasis added.) The majority simply refuses to acknowledge that the test adopted in *Masters* and *Nabozny* utilizes the same language that has been construed by this Court as requiring an *objective*

---

[9](...continued)
act sets into motion—the consequences. The intentional act committed by Robert was that of pulling the trigger of a gun. That the gun was or was not loaded does not transform the nature of the insured's volitional act.

11

standard of inquiry.

Without offering any rationale for doing so, the majority makes the insured's subjective belief regarding the status of the gun definitive, as though no contrary conclusion were possible. The issue is whether, in intentionally creating a direct risk of harm—pulling the trigger of a shotgun without ascertaining if it was loaded—the insured should have *reasonably* expected the consequences. Given that the applicable standard is *objective*, the insured's subjective belief is not controlling.

Inexplicably, under the standard adopted by the majority, neither the holding nor the outcome in *Masters* or *Nabozny* could be sustained today.

### III. APPLICATION OF *MASTERS* AND *NABOZNY*

In the present case, it is uncontested that Robert McCarn intentionally aimed the weapon at the victim, engaged the hammer, and pulled the trigger.[10] Because he denied intending the actual injury, the event is an "occurrence" only if he should not have *reasonably* expected the consequences in light of the direct risk of harm intentionally created.

The scope of the direct risk of harm created by an insured's act is necessarily dependent upon the nature of the

---

[10] As such, the acts admitted by the insured constitute felonious assault, MCL 750.82.

intentional act and the facts and circumstances surrounding the event. The direct risk of harm created by intentionally throwing knives, for example, is far greater than the direct risk of harm created by intentionally throwing cotton balls. In each instance, the natural result of the voluntary act must be considered. See 9 Couch, Insurance, 3d, § 126:27, p 126-53.

What is the direct risk of harm consonant with pulling the trigger of a firearm? The obvious risk is that the weapon, if loaded, might discharge and cause an injury. In my view, the evidence adduced at the summary disposition stage warrants the conclusion that the insured should have reasonably expected the consequences of his intentional act.

In his deposition testimony, McCarn testified that he consumed marijuana before taking the weapon out of storage. He also testified that he believed that the gun was unloaded and that he was "just playing" when he pulled the trigger of the weapon. However, he later admitted that he intended to frighten LaBelle into parting with crackers.[11]

___

[11] The majority would prefer to minimize the insured's *admitted* intent to cause harm—to commit a felonious assault. I do not. As we stated in *Nabozny*, "'where a direct risk of harm is intentionally created, and property damage or personal injury results, there is no liability coverage *even if the specific result was unintended*. It is irrelevant that the *character* of the harm that actually results is different from the *character* of the harm intended by the insured.'" 461 Mich
(continued...)

13

In addition, McCarn admitted that he did not check the status of the gun before pulling the trigger. He also testified that the last time he used the gun, he put it away hurriedly and could not recall whether he unloaded the weapon before putting it away. Further, the insured admitted that he deliberately aimed the weapon one foot away from the victim's face, engaged the hammer, and pulled the trigger in an effort to *assault* the victim.[12]

As we noted in *Nabozny*, "it can be in the interest of an insured defendant to provide testimony that will allow an injured plaintiff to recover from the insurer rather than directly from the defendant." *Id.*, at 479, n 10. As stated, I do not believe that reasonable jurors could conclude that Robert's stated beliefs about the harm he was creating were reasonable. Inasmuch as the reasonableness of Robert's expectations about the harm he created is *the* critical issue for the purpose of coverage under this policy, summary disposition in favor of plaintiff is appropriate. Therefore, I believe that the majority errs in holding that the event was

[11](...continued)
481, quoting *Marzonie*.

[12] The majority attempts to explain why Robert's later testimony about his prior use of the shotgun is not dispositive. However, I cannot think of a single reason why all the defendant's admissions should not be considered in deciding whether Robert should have reasonably anticipated the harm he caused in using his weapon.

an accident as a matter of law.

CONCLUSION

Because I believe that Robert reasonably should have expected the consequences of his actions in light of the direct risk of harm he created, I would affirm summary disposition in favor of plaintiff.[13]

CORRIGAN, C.J., and WEAVER, J., concurred with YOUNG, J.

---

[13] As to the issue of how direct a harm the insured's actions created, this would be a much closer question—and one requiring a trial—if evidence were presented that the insured had checked the gun and mistakenly (or negligently) determined that it was unloaded before pulling the trigger.